IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-00418-PAB-MJW

FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver for UNITED
WESTERN BANK,

     Plaintiff,

v.

MORGAN STANLEY CAPITAL I INC.;
MORGAN STANLEY & CO, LLC;
MORGAN STANLEY;
RBS ACCEPTANCE INC;
RBS SECURITIES, INC.; and
RBS HOLDINGS USA INC.,

     Defendants.

---

## ORDER

---

This matter is before the Court on Defendants' Joint Motion to Dismiss the

Complaint [Docket No. 77].[1]  This case arises out of defendants' sale of mortgage-

backed securities to United Western Bank ("United Western").  On February 24, 2015,

the Court granted in part plaintiff's Motion for Remand (Docket No. 45) and remanded

plaintiff's third, fourth, and fifth claims to the District Court for the City and County of

Denver.  Docket No. 100.  Defendants' motion is therefore moot with respect to those

claims, and the Court considers only plaintiff's first and second claims for violation of

---

[1]On November 17, 2014, the parties filed a Stipulation of Dismissal of defendants Bank
of America Corporation, Bank of America, N.A., Banc of America Funding Corporation,
Banc of America Mortgage Securities, Inc. (collectively, "the Bank of America
defendants"), and Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch").  Docket
No. 95.

the Colorado Securities Act ("CSA"), Colo. Rev. Stat. §§ 11-51-604(4)-(5).  Defendants

move to dismiss plaintiff's first two claims for relief on the grounds that they are barred

by the CSA's five-year statute of repose and that the FDIC fails to identify any

actionable misrepresentations.  *See* Docket No. 77 at 2-4.

## I.  BACKGROUND

Plaintiff Federal Deposit Insurance Corporation ("FDIC") was appointed as

receiver for United Western on January 21, 2011 and brings this action as successor to

claims held by United Western.  Docket No. 1-1 at 5, ¶ 5.[2]  The FDIC alleges that

defendants made untrue or misleading statements about a significant number of the

mortgage loans that they bundled into securities (known as "certificates") and sold to

United Western in the first half of 2006.  Docket No. 1-1 at 3, ¶1.

United Western purchased the certificates at issue in eight groups: (1) the first

group was issued by Wells Fargo Asset Securities Corp. and underwritten and sold by

defendant Morgan Stanley & Co. LLC ("Morgan Stanley & Co.") to United Western on

February 28, 2006, Docket No. 1-1 at 37; (2) the second group was issued by

defendant Morgan Stanley Capital I Inc. ("Morgan Stanley Capital") and underwritten

and sold to United Western by defendant Morgan Stanley & Co. on January 31, 2006,

Docket No. 1-1 at 44; (3) the third group was issued by Morgan Stanley Capital and

underwritten and sold by Morgan Stanley Co. to United Western on February 28, 2006,

Docket No. 1-1 at 50; (4) the fourth group was issued by Morgan Stanley Capital and

---

[2]Under the Federal Deposit Insurance Act, the FDIC succeeds to, and is empowered to
sue and complain in any court of law to pursue, all claims held by banks for which it is
the receiver.  12 U.S.C. §§ 1819, 1821(d)(2)(A)(i).

underwritten and sold by Morgan Stanley & Co. to United Western on April 28, 2006,

Docket No. 1-1 at 57; (5) the fifth group was issued by defendant Banc of America

Funding Corporation and underwritten and sold by defendant Merrill Lynch, Pierce,

Fenner & Smith Inc. ("Merrill Lynch") to United Western on April 3, 2006, Docket No. 1-

2 at 1; (6) the sixth group was issued by Banc of America Funding Corporation and

underwritten and sold to United Western by Merrill Lynch on May 31, 2006, Docket No.

1-2 at 7; (7) the seventh group was issued by defendant Banc of America Mortgage

Securities Inc. and underwritten and sold to United Western by Merrill Lynch on

February 28, 2006, Docket No. 1-2 at 13; and (8) the eighth group was issued by

defendant RBS Acceptance Inc. ("RBS Acceptance") and underwritten and sold to

United Western by defendant RBS Securities, Inc. on August 15, 2006.  Docket No. 1-2

at 21.[3]

 The FDIC alleges that defendants made false or misleading statements

regarding the credit quality of the mortgages backing the securities they sold to United

Western, including loan-to-value ("LTV") ratios, the number of properties that were

subject to additional, unreported liens, the extent to which the originators of those loans

adhered to their underwriting standards, the extent to which the appraisals securing the

loans were compliant with professional standards, the number of loans secured by non-

owner-occupied properties, and the extent to which defendants' inaccurate reports to

rating agencies affected the credit ratings of the certificates.  Docket No. 1-1 at 3, ¶ 1.

The FDIC's allegations are based on an investigation in which the FDIC reviewed the

---

[3]Because of the parties' stipulated dismissal of Merrill Lynch and the Bank of America defendants, certificates 5-7 are no longer at issue in this case.

offering materials and performance, rating, and pricing data for the certificates and then conducted a forensic analysis of a random sample of loans to determine whether the statements in the offering documents were accurate. *Id.* at 3, ¶¶ 2-3.  The forensic analysis used an automated valuation model ("AVM") that is designed to provide a "true market value" of a certain property as of a specified date. *Id.* at 11, ¶ 46.  According to the FDIC, the AVM is "based on objective criteria like the condition of the property and the actual sale prices of comparable properties in the same locale shortly before the specified date, and is more consistent, independent, and objective than other methods of appraisal," and "[i]ndependent testing services have determined that this AVM is the most accurate of all such models," with a mean error rate at or below 2.5%. *Id.* at 11-12, ¶ 46.

Based on these factual allegations, the FDIC alleges that Morgan Stanley & Co., Morgan Stanley Capital, RBS Securities Inc., and RBS Acceptance violated the CSA's prohibition on making misleading statements or omissions in connection with the sale of securities, Colo. Rev. Stat. §§ 11-51-604(4), 11-51-501(1)(b).  Docket No. 1-1 at 27-30, ¶¶ 110-34.  The FDIC also alleges that Morgan Stanley and RBS Holdings USA Inc. are liable under the CSA as controlling persons, Colo. Rev. Stat. § 11-51-604(5).  Docket No. 1-1 at 30-31, ¶¶ 135-47.

## II.  LEGAL STANDARD

The Court's function on a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is sufficient to

plausibly state a claim.  Fed. R. Civ. P. 12(b)(6); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations omitted).  In doing so, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation marks and citation omitted).  At the same time, however, a court need not accept conclusory allegations. *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).

Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (omission marks, internal quotation marks, and citation omitted).  The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible. *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).  However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (quotation marks and citation omitted).

### III.  ANALYSIS

### A.  Statute of Limitations

Defendants argue that the FDIC's claims are barred by the CSA's five-year statute of repose.  Docket No. 77 at 9.  Plaintiff responds that its CSA claims are timely under Section 1821(d)(14) of Title 12 (the "FDIC extender statute"), which extends the applicable statute of limitations with regard to tort claims brought by the FDIC as conservator or receiver.

Section 1821(d)(14) provides:

(A) In general

Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be–

> (i) in the case of any contract claim, the longer of--
>> (I) the 6-year period beginning on the date the claim accrues; or
>> (II) the period applicable under State law; and
>
> (ii) in the case of any tort claim (other than a claim which is subject to section 1441a(b)(14) of this title), the longer of--
>> (I) the 3-year period beginning on the date the claim accrues; or
>> (II) the period applicable under State law.

(B) Determination of the date on which a claim accrues

For purposes of subparagraph (A), the date on which the statute of limitations begins to run on any claim described in such subparagraph shall be the later of--

> (i) the date of the appointment of the Corporation as conservator or receiver; or
> (ii) the date on which the cause of action accrues.

12 U.S.C. § 1821(d)(14).  In other words, for any tort claim (such as the FDIC's CSA

claims here), the FDIC must sue within three years from either the date that it places a failed bank into conservatorship or receivership or the date on which the cause of action accrues.  *See id.*

At issue here is whether the FDIC extender statute, which names only statutes of limitations, also operates to preempt state statutes of repose.[4]  "A statute of repose . . . puts an outer limit on the right to bring a civil action."  *CTS Corp. v. Waldburger*, 134 S.Ct. 2175, 2182 (2014).  Unlike a statute of limitations, the time limit that a statute of repose imposes "is measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant."  *Id.*  A statute of repose is "therefore equivalent to a cutoff, in essence an absolute bar on a defendant's temporal liability[.]"  *Id.* at 2183 (citations, quotation, and ellipses omitted).  Defendants argue that, because the FDIC extender statute is "limited to 'statutes of limitations,' and says nothing about statutes of repose," the statute does not apply to the CSA's statute of repose.  Docket No. 77 at 11.

After defendants' motion was fully briefed, the Tenth Circuit considered this precise question in the context of a substantively identical statute.  *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199 (10th Cir. 2014) ("*NCUA II*").  In *NCUA II*, the statute at issue was Section 1787(b)(14) of Title 12 of the United States code (the "NCUA extender statute"), which extends the time period within which the National Credit Union Administration must bring an action after it places a credit union into conservatorship or liquidation.  12 U.S.C. § 1787(b)(14); *see NCUA II*, 764

---

[4]The parties do not dispute that the timeliness of the FDIC's claims hinges on whether the FDIC extender statute applies to the CSA's five-year statute of repose.

F.3d 1199.[5]

    *NCUA II* was decided on remand.  In August 2013, the Tenth Circuit held that the

NCUA extender statute applied to the three-year statute of repose in Section 13 of the

Securities Act of 1933.  *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan,*

*Inc.*, 727 F.3d 1246, 1266-67 (10th Cir. 2013) ("*NCUA I*"), *vacated*, 134 S.Ct. 2818

(2014).  The Tenth Circuit held that the NCUA extender statute, by its plain language,

extends "'*the* applicable statute of limitations' for '*any* action brought by' NCUA on

behalf of a failed credit union."  *Id.* at 1257 (emphasis in original).  Thus, although the

NCUA extender statute used the term "statute of limitations" and not "statute of repose,"

the Tenth Circuit held that the term "refers to the time limits in the Extender Statute

itself . . . not the time periods in other statutes that the Extender Statute replaces[.]"  *Id.*

In June 2014, the Supreme Court vacated *NCUA I* and remanded it to the Tenth Circuit

for further consideration in light of the Court's decision in *Waldburger*.  *Nomura,* 134

S.Ct. 2818.  In *Waldburger*, the Court held that the extender statute in the

Comprehensive Environmental Response, Compensation, and Liability Act of 1980

("CERCLA"), 42 U.S.C. § 9658 (the "CERCLA extender statute"), did not preempt state

statutes of repose.  134 S.Ct. at 2188.

    In *NCUA II*, the Tenth Circuit reaffirmed its earlier holding that the NCUA

extender statute "unambiguously displaces all pre-existing time periods," including

statutes of repose.  *NCUA II*, 764 F.3d at 1217.  *NCUA II* distinguished the CERCLA

---

[5]The FDIC and NCUA extender statutes were both enacted as part of the Financial
Institutions Reform, Recovery, and Enforcement Act of 1989.  Pub. L. No. 101-73, 103
Stat. 183.  The statutes' language is identical in all material respects.  *Compare* 12
U.S.C. § 1821(d)(14), *with* 12 U.S.C. § 1787(b)(14).

and NCUA extender statutes and held that *Waldburger's* holding was based on "factors specific to CERCLA," none of which altered the court's analysis of the NCUA extender statute, "whose surrounding language, statutory context, and statutory purpose compel a broad reading of the term 'statute of limitations'" that preempted state statutes of repose. *NCUA II*, 764 F.3d at 1210.

Because the NCUA and FDIC extender statutes are substantively identical, were enacted concurrently, and concern the same subject matter, the statutes are to be construed in pari materia. *Branum v. Nat'l Credit Union Admin. Bd.*, 2013 WL 5309125, at *6 (S.D. Miss. Sept. 19, 2013) (considering 12 U.S.C. §§ 1787(b) and 1821(d) *in pari materia*); *see also Lafayette Fed. Credit Union v. Nat'l Credit Union Admin.*, 960 F. Supp. 999, 1003 (E. D. Va. 1997) (analogizing Section 1821's exhaustion requirement to claims against the NCUA under Section 1787).  Since "all acts in pari materia are to be taken together, as if they were one law," *United States v. Stewart*, 311 U.S. 60, 64 (1940) (citation and quotation omitted), the Tenth Circuit's holding that the NCUA extender statute preempts and replaces otherwise applicable statutes of repose is binding on the Court as to the FDIC extender statute.  As such, the FDIC's claims for violation of the CSA are timely.

## B.  Failure to State a Claim

### 1.  Untrue or Misleading Statements

The CSA provides that:

Any person who sells a security in violation of section 11-51-501(1)(b)[6] (the

_____

[6]Colo. Rev. Stat. § 11-51-501(1)(b) makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the

buyer not knowing of the untruth or omission) and who does not sustain the burden of proof that such person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission is liable to the person buying the security from such person, who may sue to recover the consideration paid for the security[.]

Colo. Rev. Stat. § 11-51-604(4).

The FDIC alleges that defendants (a) made untrue or misleading statements or omissions about the LTV ratios of the mortgage loans in the collateral pools[7] and the upward bias in the appraisals of the properties that secured the loans in the collateral pools,[8] (b) making untrue or misleading statements about the occupancy status of the properties, and (c) making untrue or misleading statements about the underwriting standards of the originators of the mortgages. *See generally* Docket No. 1-1 at 10-24, ¶¶ 38-94.

### a.  Whether Defendants' Statements are Actionable

As a threshold matter, Defendants argue that "the vast majority" of the FDIC's claims fail because they are premised on mere statements of opinion concerning LTV ratios, which are not actionable.  Docket No. 77 at 19.  The Court disagrees.  Although the general rule in Colorado is that "a mere expression of an opinion . . . is not actionable," *Leece v. Griffin*, 371 P.2d 264, 265 (Colo. 1962), as the Supreme Court recently recognized, "every [statement of opinion] explicitly affirms one fact: that the speaker actually holds the stated belief. . . .  For that reason, [a] CEO's statement about

---

statements made, in the light of the circumstances under which they are made, not misleading[.]"

[7]Hereinafter referred to as "the mortgages."

[8]Hereinafter referred to as "the properties."

product quality ('I believe our TVs have the highest resolution available on the market') would be an untrue statement of fact – namely, the fact of her own belief – if she knew that her company's TVs only placed second." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, --- S.Ct. ----, 2015 WL 1291916, at *6 (Mar. 24, 2015) (citations omitted); *see also Fitzsimmons v. Honaker,* 485 P.2d 923, 926 (Colo. App. 1971) ("it is a well established rule that an intentionally false affirmation or opinion or belief . . . is actionable if the promisor had no intention of performing the promise at the time it was made"); *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 130 (S.D.N.Y. 2014) ("although . . . appraisals are matters of opinion in one sense, they also constitute factual statements: that the appraised value represents the appraiser's true belief as to the value of the property") (citing *Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 326 (S.D.N.Y. 2012)).  The FDIC alleged that the appraisals used to compute the LTVs of many of the properties "ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties."  Docket No. 1-1 at 16, ¶ 63.  The FDIC further alleged that, as a result, a material number of the upwardly biased appraisals "were not statements of the appraisers' actual findings of the values of the properties based on their objective valuations."  *Id.* ¶ 64.  In other words, the FDIC alleged that the appraisals did not reflect the appraisers' honestly-held beliefs and were intentionally inflated.  Because the FDIC has sufficiently pled that defendants believed that the statements they made in the certificates about appraisals and LTVs were inaccurate, the general rule that statements of opinion are not

actionable does not bar the FDIC's claims.[9]

Defendants also argue that the FDIC's allegations concerning credit ratings are non-actionable statements of opinion.  Docket No. 77 at 20.  The FDIC alleges that defendants omitted that the ratings of the certificates they sold were affected by various material misstatements about specific mortgages in the collateral pools, including LTVs.  Docket No. 1-1 at 24, ¶ 97.  The complaint also alleges that ratings agencies relied on the LTVs reported by defendants to determine credit ratings.  *Id.* at 10, ¶ 40.  Defendants correctly point out that "[a] . . . credit rating is a predictive opinion, dependent on a subjective and discretionary weighing of complex factors," *Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007).  However, the FDIC alleged that defendants failed to disclose that they reported inaccurate information to the credit rating agencies, and that the false information materially affected those ratings.  *See* Docket No. 1-1 at 10, ¶ 40, 24, ¶ 97.  Because the FDIC adequately pled that defendants provided inaccurate information about the LTVs, and because the credit ratings depended in part on those LTVs, the FDIC's allegations based on credit ratings are not barred as mere statements of opinion.

### b.  LTV Ratios

Defendants argue that the FDIC fails to state a claim for misstated LTV ratios, because the complaint relies on the AVM, which is "more or less a black box."  Docket

---

[9]Because the Court finds that the FDIC adequately alleged that the appraisals were not honestly believed at the time they were made, the Court does not address the FDIC's two remaining arguments, that the opinions were "not couched as matters of opinion" and that the offering documents falsely stated that the appraisals were conducted in accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP").  *See* Docket No. 86 at 21-22.

No. 77 at 22.  According to defendants, because the FDIC did not plead information about the data used in the AVM or how the AVM generated its results, the FDIC's allegations are mere conclusory assertions.  *Id.* at 23.  Defendants do not dispute the materiality of LTV ratios.  *See id.*

The Court finds that the FDIC alleged sufficient factual information, taken as true, to state a claim for false or misleading statements concerning LTV ratios.  The FDIC alleged that the AVM is "a comprehensive, industry-standard automated valuation model . . . by which one can determine the true market value of a certain property as of a specified date."  Docket No. 1-1 at 11-12, ¶ 46.  The FDIC further alleged that AVMs are "routinely used by mortgage lenders" and that the AVM used by the FDIC is "the most accurate of all such models."  *Id.*  The FDIC's allegations that defendants misrepresented LTV ratios plead that, based on the AVM, the appraisals were substantially upwardly biased at the time they were issued.  This renders the FDIC's claims that defendants misrepresented the appraisals' upward bias in order to inflate the values of the appraised values plausible.

Defendants also argue that the AVM's results are a mere "different opinion on valuation from the original appraisals."  Docket No. 77 at 23.  The FDIC, however, alleged that the appraisals were not believed when made and that defendants intentionally concealed that the appraisals ignored relevant information in order to inflate property values.  Docket No. 1-1 at 16, ¶¶ 63-64.  Whether the original appraisals were intentionally inflated, as the FDIC alleges, or a mere inconsistent opinion produced by a different appraisal method, as defendants suggest, is a question of fact not suited to resolution on a Rule 12(b)(6) motion.

### c.  Undisclosed Additional Liens

Defendants argue that the FDIC does not identify any misrepresentation concerning undisclosed additional liens for two reasons: first, because the offering documents expressly state that the LTV ratios were based on first or primary loans, not on secondary or additional loans, and second, because the offering documents disclosed the possibility that the properties could be subject to secondary financing or junior liens.  Docket No. 77 at 24-25.  The FDIC responds that defendants' disclosures were too general to warn of the risk of existing additional liens and that, even though defendants advised that the properties might be subject to additional liens, defendants are still liable for omitting that, at the time of origination, many properties already were subject to such liens.  Docket No. 86 at 27.

With respect to defendants' first argument, the Court agrees with the FDIC that the definition of LTV ratios as including only primary financing does not excuse defendants from liability for omitting information about existing additional liens that is material to the risk of the certificates.  *See FDIC as Receiver for Colonial Bank v. Chase Mortg. Fin. Corp.*, 2013 WL 5434633 at *8 (S.D.N.Y. Sept. 27, 2013) (holding that even where the offering documents "make explicit that the LTV . . . numbers they provide consist of the ratio only of the *subject mortgage* to the value of the property," omitting additional liens is material) (emphasis in original).  Defendants do not contest that the additional liens were material, and the mere fact that the offering documents disclosed that one number – the LTV ratio – did not take additional liens into account is not an absolute shield from omitting that additional material information from the

offering documents.

With respect to defendants' second argument, the Court agrees with defendants that, to the extent that the offering documents advised potential investors that the subject properties might be subject to additional liens, the FDIC cannot state a claim for material misrepresentation or omission.[10]   The offering documents for certificates 2, 3, and 4[11] all stated that it was possible that the subject properties might be subject to additional liens.[12]   The FDIC argues that, while defendants disclosed that mortgages *may* be subject to additional liens, they omitted that a number of mortgages *were* subject to such liens.  Docket No. 86 at 27.  This is a distinction without a difference.

---

[10]On a motion to dismiss pursuant to Rule 12(b)(6), the Court may take judicial notice of documents outside of the complaint if "the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."  *Alvarado*, 493 F.3d at 1215.

[11]Certificates 2, 3, and 4 are, respectively, Morgan Stanley Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2006-1AR, Morgan Stanley Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2006-3AR, and Morgan Stanley Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2006-6AR.  *See* Docket No. 1-1 at 43, 50, 57.

[12]*See* Docket No. 78-10 at 9 (providing that the LTV ratio "[d]oes not take into account any secondary financing on the Mortgage Loans in Loan Group 1 that may exist at the time of origination"); 15 ("Certain of the mortgage loans may be secured by junior liens"); 17-18 ("If the outstanding balance of a loan and any secondary financing on the underlying property is greater than the value of the property, there is an increased risk of delinquency, foreclosure and losses."); *see also* Docket No. 78-11 at 7 ("Does not take into account any secondary financing on the Mortgage Loans in Loan Group 1 that may exist at the time of origination"); 16 ("Certain of the mortgage loans may be secured by junior liens"); 17 ("If the outstanding balance of a loan and any secondary financing on the underlying property is greater than the value of the property, there is an increased risk of delinquency, foreclosure and losses.); Docket No. 78-12 at 9 ("Does not take into account any secondary financing on the Mortgage Loans in Loan Group 1 that may exist at the time of origination"); 16 ("The trust may contain loans that are in a junior lien position").

The originating documents for certificates 2, 3, and 4 warned investors about the possibility of additional liens and stated that the LTV ratios did not take into account such liens.  This disclosure was sufficient to put investors on notice of the risk that a number of the properties would be subject to additional liens, and that the offering documents did not include an estimate of how many such additional liens existed.

The cases cited by the FDIC do not compel a different result.  In *Colonial/Chase*, the court considered only whether the FDIC could maintain a claim for material omission notwithstanding the definition of LTV in the offering documents.  2013 WL 5434633 at *8.  The court did not consider whether express language in the offering documents that provided for the possibility of additional liens precluded such a claim.  *See id.*  Likewise, the Court does not consider the Alabama circuit court decision attached to the FDIC's response, *FDIC as Receiver for Colonial Bank v. Banc of America Funding Corp., et al.*[13] to be persuasive.  That decision rejected only the unspecified argument that "failure to disclose the existence of additional liens on the underlying properties constituted actionable misstatements are foreclosed by language in the Offering Documents."  Docket No. 86-1 at 9.  The Court cannot determine whether the unidentified "language in the Offering Documents" in *Colonial/Banc of America* was similar to the disclosures in certificates 2, 3, and 4 here.

Because the disclosures in certificates 2, 3, and 4 were sufficient to advise investors of the risk of additional liens on the properties, the FDIC cannot maintain a cause of action for material omission based on a failure to disclose the existence of

---

[13]Case No. 03-cv-2012-901035, slip op. (Circuit Ct. Montgomery Cnty., Ala. Apr. 20, 2014) (attached to the FDIC's response as Exhibit A).

additional liens.  The Court therefore grants defendants' motion to dismiss the FDIC's claims based on failure to disclose additional liens with respect to certificates 2, 3, and 4.  Because defendants have not presented evidence of similar disclosures in certificates 1 or 8, *see* Docket No. 77 at 25, n.18, the Court denies defendants' motion to dismiss this claim with respect to those certificates.

### d. Departures from Underwriting Standards

Defendants argue that the FDIC cannot state a claim based on loan originators' departure from underwriting standards because the FDIC's allegations rely only on general information about early payment defaults and high delinquency rates.  Docket No. 77 at 27.  The Court disagrees.  The FDIC alleges that defendants failed to disclose to investors that originators were making "wholesale, rather than case-by-case, exceptions" to their underwriting standards.  Docket No. 1-1 at 21, ¶ 86.  As evidence for this claim, the FDIC alleges that the high rates of delinquency and default "between 2004 and the dates of these securitizations" were a result of "deterioration in credit characteristics that were not disclosed to investors," and that "what was true about recently securitized mortgage loans in general was true in particular of loans originated by" defendants.  *Id.* at 21, ¶¶ 87-89.  The FDIC further alleges that the mortgage loans in the specific collateral pools at issue in this case have experienced very high rates of delinquencies, which is "evidence that the originators of those loans may have disregarded their underwriting standards in making the loans."  *Id.* at 23, ¶ 92.  These allegations are sufficient to render the FDIC's claims plausible and to put defendants on notice as to the basis for the FDIC's claim.

17

Defendants argue that the offering documents disclosed that mortgage originators were permitted to make exceptions to their guidelines.  Docket No. 77 at 26.  The FDIC, however, alleged that "the originators were making wholesale, rather than case-by-case, exceptions to those underwriting standards."  Docket No. 1-1 at 21, ¶ 86.  "General warnings about the . . . use of exceptions to underwriting guidelines when there are compensating factors . . . do not clearly suffice at th[e motion to dismiss] stage . . . to persuade the court that an investor was adequately warned that the underwriting standards . . . were systematically abandoned."  *Nat'l Credit Union Admin. Bd. v. RBS Securities, Inc.*, 900 F. Supp. 2d 1222, 1256 (D. Kan. 2012), *aff'd sub nom. NCUA I*, 764 F.3d 1199, *vacated on other grounds by Nomura Home Equity Loan, Inc. v. Nat'l Credit Union Admin. Bd.*, 134 S.Ct. 2818 (2014).

### e.  Failure to Comply with USPAP

Defendants argue that the FDIC's allegations that appraisers did not comply with USPAP requirements are a bare assertion devoid of factual allegations.  Docket No. 77 at 28.  The Court disagrees.  The FDIC alleged that USPAP requires appraisers to "analyze such comparable sales data as are available to indicate a value conclusion."  Docket No. 1-1 at 17, ¶ 66(b).  The FDIC also alleged that the appraisals used in the securitizations "ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable."  *Id.* at 16, ¶ 63.  This is sufficient to put defendants on notice of the FDIC's claim.

### f.  Occupancy Status

Defendants argue that the FDIC cannot state a claim for untrue or misleading

18

statements concerning owner occupancy rates because owner occupancy status data was "based solely upon representations from the third-party mortgage borrowers." Docket No. 77 at 29.  Defendants do not dispute that the representations in the offering documents concerning owner occupancy were incorrect or that information concerning owner occupancy is material.  *See id.*

Under the CSA, defendants who make an untrue statement of fact in connection with the sale of a security bear the burden to prove that they "did not know, and in the exercise of reasonable care could not have known, of the untruth or omission."  Colo. Rev. Stat. § 11-51-604(4).  This provision of the CSA is analogous to Section 11 of the 1933 Securities Act, which provides a cause of action for any untrue statement of material fact made in connection with a registration statement, but provides defendants with a due diligence defense for which defendants bear the burden of proof.  *See* 15 U.S.C. §§ 77k(a)-(b).[14]

Under Section 11, defendants cannot meet their burden of proof merely by attributing untrue statements in offering documents to third parties.  *FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 330 (S.D.N.Y. 2012) ("a Securities Act defendant cannot simply claim that she blindly reported information given to her by third parties and thereby avoid liability for inaccuracies that made their way into the offering materials").  Moreover, as numerous courts have held, whether defendants knew of the falsity or omission in exercising reasonable care is a question of fact that is not

---

[14]Under Colorado law, interpretation of federal securities laws that parallel provisions of the CSA are "highly persuasive."  *Lowery v. Ford Hill Inv. Co.*, 556 P.2d 1201, 1204 (Colo. 1976).

appropriate to resolve on a motion to dismiss. *See Callan v. Motricity Inc.*, 2013 WL 195194 at *5 n.5 (W.D. Wash. Jan. 17, 2013) ("Because defendants bear the burden of demonstrating the applicability of the due diligence defenses, they are unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6)"); *In re Wachovia Equity Secs. Litig.*, 753 F. Supp. 2d 326, 379 (S.D.N.Y. 2011) ("due diligence is . . . unavailing on a motion to dismiss"); *In re Lehman Bros. Secs. and ERISA Litig.*, 684 F. Supp. 2d 485, 494 (S.D.N.Y. 2010) (noting that defendants "are strictly liable for any misstatements in the Offering Documents that they signed unless they can establish the due diligence defense, an issue inappropriate for consideration on a motion to dismiss").

The Court finds these federal authorities persuasive in interpreting the CSA. Like Section 11, the CSA makes it unlawful to make an untrue statement of material fact in connection with the sale of a security unless the seller can prove that it could not have known of the untruth or omission despite exercising reasonable diligence. *See* Colo. Rev. Stat. §§ 11-51-501(b); 11-51-604(4). The fact that defendants' offering documents contained misstatements made by third parties does not immunize defendants from liability under this statutory scheme. The Court therefore denies defendants' motion to dismiss with respect to the FDIC's allegations concerning owner occupancy rates.

### g. Credit Ratings

Defendants argue that the FDIC's allegations concerning credit ratings should be dismissed because the offering documents "expressly disclosed the risks and

limitations associated with credit ratings, including that a rating prepared by an independent rating agency is not a recommendation to buy, sell or hold securities and the assigning rating organization may revise or withdraw a rating at any time." Docket No. 77 at 30 (quotation omitted). As discussed *supra*, however, the complaint does not simply allege that the credit ratings were faulty. The FDIC also alleges that the ratings were manipulated because defendants reported inaccurate LTVs to the credit rating agencies, and that defendants did not disclose these inaccurate reports in the offering documents. *See* Docket No. 1-1 at 10, ¶ 40, 24, ¶ 97. These allegations are sufficient to state a claim that defendants' statements about the credit ratings of the certificates were misleading.

### 2. *Controlling Person Liability*

Defendants argue that, since the FDIC's primary liability claims under the CSA fail, its claims against defendants for liability as "controlling persons" under Section 11-51-604(5) of the CSA fail as well. Docket No. 77 at 31. Defendants do not contest that, if primary liability is established, defendants Morgan Stanley and RBS Holdings USA Inc. are controlling persons as defined by the CSA. *See id.* As discussed above, a number of the FDIC's primary liability claims survive defendants' motion to dismiss. The Court will therefore dismiss plaintiff's "controlling persons" claims to the same extent it dismisses plaintiff's primary liability claims.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendants Morgan Stanley Capital I Inc., Morgan Stanley &

Co., LLC, Morgan Stanley, RBS Acceptance Inc., RBS Securities, Inc., and RBS

Holdings USA Inc.'s Joint Motion to Dismiss the Complaint [Docket No. 77] is

**GRANTED** in part and **DENIED** in part.  Defendants' motion is **GRANTED** as to the

portion of plaintiff's first and second claims for relief that seek recovery for failure to

disclose the existence of additional liens on the subject properties in certificates 2, 3,

and 4.  It is **DENIED** in all other respects.

DATED March 24, 2015.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge