IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 14-cv-00418-PAB-NRN

FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver for UNITED
WESTERN BANK,

 Plaintiff,

v.

RBS ACCEPTANCE INC,
RBS SECURITIES, INC., and;
RBS HOLDINGS USA INC.,

 Defendants.

---

**ORDER**

---

 This matter is before the Court on Defendants' Omnibus Motion for Summary

Judgment [Docket No. 248]. The Court has subject matter jurisdiction under 28 U.S.C.

§ 1331 and 12 U.S.C § 1819(b)(2)(A) ("Except as provided in subparagraph (D), all

suits of a civil nature at common law or in equity to which the [FDIC], in any capacity, is

a party shall be deemed to arise under the laws of the United States.").

## I. BACKGROUND[1]

 The dispute in this case is based on defendants' sale of residential mortgage-

backed securities to United Western Bank ("UWB"). In 2006, UWB purchased the

HVMLT-2006-7 B-2 Certificate (the "Certificate"), which was backed by approximately

5,119 residential mortgage loans originated and underwritten by American Home

---

[1]The following facts are undisputed unless noted otherwise.

Mortgage ("American Home") in 2005 and 2006. Docket No. 248 at 4-5, 8, ¶¶ 1-2, 22; Docket No. 257 at 7, ¶ 65. The Certificate was issued and underwritten by defendants. Docket No. 248 at 4, ¶ 1.[2]

Before the sale, defendants sent UWB preliminary marketing materials regarding the Certificate. *Id.* at 5, ¶ 4. These materials warned that the information provided therein was "preliminary and . . . subject to completion or change." *Id.,* ¶ 5. At some point prior to August 15, 2006, UWB employees Ben Hirsch and Pat Howard approved UWB's purchase of the Certificate. *Id.* at 6, ¶ 9. UWB completed the purchase on August 15, 2006. *Id.*, ¶ 8. The same day, defendants filed the HVMLT 2006-7 Prospectus Supplement ("prospectus supplement") with the Securities and Exchange Commission ("SEC"). *Id.* Neither Mr. Hirsch nor Mr. Howard recalled reviewing the prospectus supplement before purchase. *Id.*, ¶¶ 10, 11.[3]

The preliminary marketing materials and prospectus supplement made various representations regarding the Certificate and the underlying mortgage loans. For example, both the preliminary marketing materials and the prospectus supplement stated that the weighted average loan-to-value ratio ("LTV") of the underlying loans was

---

[2]The Certificate was an investment vehicle providing "two forms of monthly distributions: (1) repayment of principal, derived from principal payments homeowners made on the underlying mortgage loans collateralizing the certificate and (2) interest income based on the outstanding principal balance of the certificate at the end of each payment cycle." Docket No. 248 at 13, ¶ 62; *see also* Docket No. 250 at 9-10. The interest payments were calculated based on the "Coupon Rate" specified in the Certificate. *See* Docket No. 248 at 13, ¶ 63; Docket No. 250 at 3, 9.

[3]The parties dispute whether James Sherrill, the trader who purchased the Certificate for UWB, reviewed the prospectus supplement prior to completing the purchase. *See* Docket No. 248 at 6, ¶ 12; Docket No. 257 at 3, ¶ 12.

between 75.26% and 75.27% and that the weighted average effective LTV for the loans was 64.86%.  Docket No. 257 at 7-8, ¶¶ 67, 70;  *see also* Docket No. 249-4 at 28 (preliminary marketing materials); Docket No. 250 at 5 (prospectus supplement).  The prospectus supplement also stated that the "mortgage loans were originated in accordance with the underwriting guidelines described under 'Mortgage Loan Origination – Underwriting Standards' herein."  Docket No. 257 at 10, ¶ 82; Docket No. 250 at 12.[4]  Under those standards, "exceptions to American Home's underwriting guidelines [were] allowed if sufficient compensating factors exist[ed] to offset any additional risk due to the exception."  Docket No. 250 at 19; *see also id.* at 17; Docket No. 257 at 10, ¶ 82.  Finally, the prospectus supplement stated that "[e]very mortgage loan [was] secured by a property that ha[d] been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice [("USPAP")] of the Appraisal Foundation."  Docket No. 257 at 11, ¶ 88; Docket No. 250 at 18.

Before selling the Certificate, defendants hired Hansen Quality to assess the reasonableness of the appraised values for a sample set of loans included in the Certificate.  Docket No. 257 at 12, ¶ 91.  Defendants also hired The Clayton Group ("Clayton") to determine whether the loans complied with underwriting guidelines and applicable law.  *Id.*, ¶ 96.

In October 2006, UWB enlisted J.P. Morgan to analyze the credit quality of its securities portfolio, which included the Certificate.  Docket No. 248 at 11, ¶ 45.  J.P.

---

[4]"Mortgage loan underwriting is the process by which lenders evaluate the risk of making a loan to a prospective borrower" and involves an assessment of whether a prospective borrower meets certain criteria established by the applicable underwriting guidelines.  Docket No. 248 at 7, ¶¶ 17-18.

Morgan and UWB "both agreed that the portfolio was of high quality and that there were no signs of any credit deterioration or any problematic securities." Docket No. 257 at 14, ¶ 106. Between 2006 and 2008, UWB tracked the performance of the mortgage loans backing the Certificate. Docket No. 248 at 11, ¶ 46. By January 2008, 11.31% of the loans backing the Certificate had experienced delinquencies or foreclosures. *Id.*, ¶ 48.[5] However, the Certificate maintained an investment grade rating. Docket No. 257 at 14, ¶ 107.

On January 21, 2011, UWB failed and was placed in receivership by the Federal Deposit Insurance Corporation ("FDIC"). Docket No. 248 at 5, ¶ 3. On January 15, 2014, the FDIC, acting in its capacity as receiver for UWB, filed this lawsuit in the District Court for the City and County of Denver, Colorado, asserting state and federal securities law claims against various defendants based on allegedly false and misleading statements made in connection with ten mortgage-backed certificates, including the Certificate, purchased by UWB. *See* Docket No. 4 at 3, ¶ 1. On February 14, 2014, the defendants removed the case to federal court. *See* Docket No. 1.

On November 14, 2014, plaintiff voluntarily dismissed its claims against defendants Banc of America Funding Corporation, Bank of America Corporation, Banc of America Mortgage Securities, Inc., Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith, Inc. Docket No. 95. Through orders entered on February 24, 2015 and March 24, 2015, the Court remanded plaintiff's federal securities act claims against

_____

[5]While plaintiff appears to dispute this fact, *see* Docket No. 257 at 5, ¶ 48, plaintiff's explanation, which bears no relationship to delinquency and foreclosure rates, suggests that the paragraphs of plaintiff's response are misnumbered.

the remaining defendants to state court, *see* Docket No. 100 at 9 (remanding plaintiff's third, fourth, and fifth claims for relief to state court), and dismissed plaintiff's first and second claims for relief to the extent they sought recovery for defendants' failure to disclose the existence of additional liens on properties in certificates 2, 3, and 4. Docket No. 103 at 22. On February 26, 2016, plaintiff voluntarily dismissed its claims against the Morgan Stanley defendants. Docket No. 141.

On January 5, 2018, the sole remaining defendants in the case, RBS Acceptance Inc., RBS Securities Inc., and RBS Holdings USA Inc. (hereinafter "defendants"), moved for summary judgment. Docket No. 248. The claims at issue in the summary judgment motion arise under §§ 11-51-501(1)(b) and 11-51-604(4) of the Colorado Securities Act, which create liability for any person who, in connection with the sale of a security, "make[s] any untrue statement of a material fact or . . . omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." Colo. Rev. Stat. §§ 11-51-501(1)(b), 11-51-604(4). As a basis for its claims, plaintiff alleges that defendants made materially false and/or misleading statements in connection with the sale of the Certificate to UWB in 2006. *See generally* Docket No. 4.[6]

On February 21, 2018, plaintiff filed a response to defendants' motion, Docket No. 257, to which defendants replied on March 21, 2018. Docket No. 263. On June 13, 2018, plaintiff filed a notice of supplemental authority, Docket No. 268, which the

---

[6]Plaintiff also asserts a claim for controlling person liability under Colo. Rev. Stat. § 11-51-604(5). Docket No. 4 at 30. Defendants do not separately challenge that claim in their summary judgment motion.

Court has considered in resolving defendants' summary judgment motion below.

## II. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (internal quotation marks omitted) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but

instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. When considering a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*

## III.  ANALYSIS

Defendants move for summary judgment on three grounds: (1) plaintiff has not shown that UWB relied on any alleged misstatements in the prospectus supplement, Docket No. 248 at 14-19; (2) there is no evidence that defendants made materially false statements regarding American Home's compliance with underwriting guidelines and any underwriting claims are untimely, *id.* at 19-24; and (3) plaintiff has not asserted an actionable claim that the opinions of value offered by the original appraisers were falsified or intentionally inflated. *Id.* at 25-28. Defendants also seek a determination that prejudgment interest on any damages award should be calculated at the "Coupon Rate" set forth in the Certificate. *Id.* at 28-30.

### A.  Reliance

Defendants argue they are entitled to summary judgment on all claims because plaintiff cannot demonstrate that UWB relied on any misstatements in the prospectus supplement. Docket No. 248 at 18. Plaintiff responds that § 11-51-604(4) of the Colorado Securities Act does not require reliance as an element of a cause of action and that, even if it did, the evidence creates a genuine issue of fact regarding whether

UWB relied on the alleged misstatements.  Docket No. 257 at 15-22.

The Court begins by addressing whether plaintiff is required to prove reliance as an element of its cause of action under Colo. Rev. Stat. § 11-51-604(4).  Because the parties' dispute on this issue presents a question of statutory interpretation, the Court looks first "to the plain language of the controlling statutes under [Colorado] law," before turning to case law interpreting similar federal statutes and regulations.  *Cagle v. Mathers Family Trust*, 295 P.3d 460, 465 (Colo. 2013) (internal quotation marks omitted); *Black Diamond Fund, LLLP v. Joseph*, 211 P.3d 727, 736 (Colo. App. 2009).  In construing the language of Colorado statutes, the Court applies "fundamental principles of statutory construction."  *Black Diamond Fund, LLLP*, 211 P.3d at 736.  Thus, the Court gives statutory terms "their plain and ordinary meaning" and "consider statutes as a whole, construing each provision in harmony with the overall statutory scheme, structure, and purpose" with the goal of "ascertain[ing] and giv[ing] effect to the intent of the General Assembly."  *Id.*

Section 11-51-604(4) states, in relevant part:

> Any person who sells a security in violation of section 11-51-501(1)(b) (the buyer not knowing of the untruth or omission) and who does not sustain the burden of proof that such person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission is liable to the person buying the security from such person, who may sue to recover the consideration paid for the security, together with interest at the statutory rate from the date of payment, costs, and reasonable attorney fees, less the amount of any income received on the security, upon the tender of the security, or is liable for damages if the buyer no longer owns the security.

Colo. Rev. Stat. § 11-51-604(4).  The provision therefore creates an express cause of action for sales of securities in violation of § 11-51-501(1)(b).  Section 11-51-501(1)(b)

makes it

> unlawful for any person, in connection with the offer, sale, or purchase of
> any security, directly or indirectly . . . [t]o make any untrue statement of a
> material fact or to omit to state a material fact necessary in order to make
> the statements made, in the light of the circumstances under which they
> are made, not misleading. . . .

Colo. Rev. Stat. § 11-51-501(1)(b).

Nothing in the plain language of these sections requires proof of reliance. The statutory language requires only that (1) the defendant made an untrue statement or omission of a material fact in connection with the sale of a security; (2) the plaintiff did not know of the untruth or of the omission; and (3) the defendant knew, or in the exercise of reasonable care could have known, of the untruth or omission. *See F.D.I.C. v. Countrywide Fin. Corp.*, 2013 WL 49727, at *3 (C.D. Cal. Jan. 3, 2013) (holding that neither reliance nor causation is an element of Colo. Rev. Stat. § 11-51-501(1)(b)); *Gohler v. Wood*, 919 P.2d 561, 563 (Utah 1996) (holding that similar statute under Utah law does not require reliance).[7]  As the Utah Supreme Court reasoned in *Gohler*, the fact that the legislature "plainly articulated a plaintiff's required statement of mind" – lack of knowledge – "but was silent as to whether the plaintiff must have relied on the untruth or omission to recover clearly indicates that the legislature did not intend to adopt a reliance requirement." 919 P.2d at 563.

The Court's analysis does not end here, however. While defendants do not dispute that there is no express reliance requirement in §§ 11-51-501(1)(b) and 11-51-

---

[7]Under the plain terms of the statute, the last of these elements is an affirmative defense. Thus, a defendant has the burden of proving that it did not know, or in the exercise of reasonable care could not have known, of the untruth or omission in order to avoid liability.

9

604(4), they argue that the Court should look beyond the plain language of the statute and construe § 11-51-501(1)(b) in accordance with its federal analogs, § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, which have long been interpreted to require proof of reliance. *See* Docket No. 248 at 15; *Amgen Inc. v. Conn. Retirement Plans & Trust* Funds, 568 U.S. 455, 461 (2013) ("Reliance . . . is an essential element of the § 10(b) private cause of action because proof of reliance ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." (internal quotation marks omitted)); *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988) ("We agree that reliance is an element of a Rule 10b-5 cause of action.").[8]  In support of their argument, defendants cite § 11-51-101(3) of the Colorado Securities Act, which provides that the

> provisions of this article and rules made under this article shall be coordinated with the federal acts and statutes to which references are made in this article and rules and regulations promulgated under those federal acts and statutes, to the extent coordination is consistent with both the purposes and provisions of this article.

Colo. Rev. Stat. § 11-51-101(3).  Although this section does not require courts to defer to interpretations of the federal securities laws where doing so would conflict with the plain language of the Colorado Securities Act, *Cagle*, 295 P.3d at 465 (stating that, notwithstanding § 11-51-101(3), courts should look first to the plain language of the Colorado statutes), the Colorado Supreme Court has recognized that, "insofar as the provisions and purposes of [the Colorado Securities Act] parallel those of the federal enactments, . . . federal authorities are highly persuasive."  *Id.* (internal quotation marks

---

[8]The SEC promulgated Rule 10b-5 pursuant to its authority under § 10(b).  *Basic Inc.*, 485 U.S. at 230.

omitted); *see, e.g.*, *Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095, 1100-01 (Colo. 1995) (looking to federal law to construe the pleading requirements of §§ 11-51-123 and 11-51-125(2) of a previous version of the Colorado Securities Act).[9]

Defendants' attempt to analogize § 11-51-501(1)(b) to SEC Rule 10b-5 for purposes of inferring a reliance requirement is not without support.  *See Rosenthal*, 908 P.2d at 1101 (citing case law interpreting SEC Rule 10b-5 in holding that predecessor versions of Colo. Rev. Stat. §§ 11-51-501(1) and 11-51-604(3), Colo. Rev. Stat. §§ 11-51-123(1) and 11-51-125(2), required proof of reliance or causation); *People v. Riley*, 708 P.2d 1359, 1363 (Colo. 1985) (noting that Colo. Rev. Stat. § 11-51-123(1) was "identical to section 101 of the Uniform Securities Act, 7B U.L.A. 516 (1985)," which, in turn, was "substantially identical to Rule 10b-5 of the Securities and Exchange Commission"), *abrogated in part on other grounds as recognized in F.D.I.C. v. First Interstate Bank of Denver, N.A.*, 937 F. Supp. 1461, 1473 (D. Colo. 1996). Nevertheless, the Court finds defendants' approach to be flawed.

First, Colo. Rev. Stat. §§ 11-51-501(1)(b) and 11-51-604(4) are fundamentally distinct from § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 in that the Colorado provisions create an express cause of action for untrue statements or

---

[9]Although §§ 11-51-501(1) and 11-51-604(4) are substantially similar to SEC Rule 10b-5 & § 12(a)(2) of the Securities Act of 1933, the predecessor versions of the Colorado provisions were modeled directly on the Uniform Securities Act.  *See People v. Blair*, 579 P.2d 1133, 1138 (Colo. 1978) ("Section 11-51-123 and 124, C.R.S. 1973 came from the Uniform Securities Act, sections 101 and 409.  Section 101 of the Uniform Securities Act is substantially the same as the well-known Rule 10b-5 of the Securities and Exchange Commission." (internal citation omitted)); *Lowery v. Ford Hill Inv. Co.*, 556 P.2d 1201, 1209 (Colo. 1976) ("The provisions of section 11-51-125, C.R.S. 1973, were adopted intact from the text of the Uniform Securities Act and are almost identical to 15 U.S.C. § 77l(2) (1970).").

omissions made in connection with the sale of securities.  *See* Colo. Rev. Stat. § 11-51-604(4).  In contrast, the federal cause of action is implied.  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 164 (2008) ("The § 10(b) private cause of action is a judicial construct that Congress did not enact in the text of the relevant statutes."); *see also Green v. Green*, 293 S.W.3d 493, 506 n.28 (Tenn. 2009) (discussing implied federal cause of action).  As the Utah Supreme Court explained in *Gohler*, "because the federal cause of action is implied, federal courts have had to define its elements and have derived these elements," one of which is reliance, "at least in part, from the common law of fraud."  919 P.2d at 565; *see also Basic Inc.*, 485 U.S. at 243 (agreeing that, just as reliance is an element of both common-law fraud and a right of action under § 18(a) of the Securities Exchange Act of 1934, it is also an element of a Rule 10b-5 cause of action); *Green*, 293 S.W.3d at 506 n.28 (noting that the federal "implied right of action resembles, but is not identical to, common-law tort actions for deceit and misrepresentation").  Here, however, there is no need to define the elements of a cause of action under the Colorado Securities Act because those elements, none of which include reliance, are expressly identified in § 11-51-604(4). *See Green*, 293 S.W.3d at 508 (noting that, by focusing on the textual similarities and differences between the Tennessee Securities Act and the federal securities law, the Courts of Appeals "lost sight of the fact that the Tennessee General Assembly had already included the elements of the statutory claims in Tenn. Code Ann. § 48-2-122 and, thus, that they did not need to look to federal law or the common law for guidance"); *Cuene v. Hilliard*, 754 N.W.2d 509, 517 (Wis. Ct. App. 2008) (holding that

the causal element of a Wisconsin securities law claim was defined by statute rather than an inferred reliance requirement and distinguishing federal securities law on the ground that the federal cause of action is implied); *Gohler*, 919 P.2d at 565 (declining to establish a reliance requirement under the Utah Securities Act because, unlike with the federal cause of action, the elements of a cause of action under the Utah Act had already been defined by the legislature); 12A Joseph C. Long et al., *Blue Sky Law* § 9:41 (updated June 2019) (arguing that, when anti-fraud language and an express right of action are included in a state securities statute, "the language of the statute[], not a comparable common-law tort, should provide the elements necessary for recovery"); David O. Blood, *There Should be No Reliance in the "Blue Sky*," 1998 B.Y.U. L. Rev. 177, 184-85 (1998) (stating that "justification for imposing [a reliance] requirement" under the Uniform Securities Act "can only be based on an implied cause of action, as in the federal arena," but noting that the drafters "precluded inclusion of a reliance element" by "explicitly prohibiting implication of any new cause of action based on the Act"); *cf. Kittilson v. Ford*, 608 P.2d 264, 265 (Wash. 1980) (declining to read scienter requirement into Washington State Securities Act and distinguishing cases interpreting § 10(b) of the Securities Exchange Act and SEC Rule 10b-5 on the ground that, unlike under federal law, the language used in the Washington Securities Act "is not derivative but is the statute").[10]

Defendants argue that the Colorado General Assembly must have intended claims for violations of § 11-51-501(1)(b) to include a reliance element because, "by the

---

[10]The Colorado Securities Act also prohibits the creation of any cause of action not specified in §§ 11-51-606 or 11-51-602. *See* Colo. Rev. Stat. § 11-51-604(12).

time the Colorado Legislature enacted the CSA (as well as the 1990 amendments thereto), federal courts – including the Supreme Court – had already determined that Rule 10b-5, including subpart (b) addressing material misstatements and omissions, required proof of reliance."  Docket No. 248 at 16.  Defendants invoke the interpretive principle that a legislature "is presumed to be aware of and accept case law interpretations of statutes, particularly in circumstances in which an amendment follows publication of the case."  *In re A.M.D.*, 78 P.3d 741, 750 (Colo. 2003); *see* Docket No. 263 at 7.  However, application of this principle highlights the second flaw in defendants' argument: the Colorado provision that creates the private right of action for untrue statements or omissions, § 11-51-604(4), is "virtually identical" to § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2), *Goss v. Clutch Exchange, Inc.*, 701 P.2d 33 (Colo. 1985) (interpreting predecessor versions of Colo. Rev. Stat. § 11-51-604(4) and § 12(a)(2) of the Securities Act of 1933), which has long been interpreted by federal courts as not requiring reliance.  *See, e.g.*, *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 578 (1995) (noting that the previous version of § 12(a)(2), § 12(2) of the Securities Act of 1933, gave buyers of securities "a right to rescind, without proof of fraud or reliance"); *United Food & Commercial Workers Union Local 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1233 (10th Cir. 2014) (stating that § 12(a)(2) of the Securities Act of 1933 does not require a plaintiff to "allege scienter, reliance, or loss causation" (internal quotation marks omitted); *MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/American Express Inc.*, 886 F.2d 1249, 1256 (10th Cir. 1989) (noting that § 12(2) "ha[d] no requirement of justifiable reliance on the part of a

purchaser").[11]  The question then becomes – if the Colorado Supreme Court were to look to federal law to interpret §§ 11-51-501(1)(b) and 11-51-604(4), which line of precedent would that court consider persuasive?

Courts that have interpreted similar state securities laws are divided on this issue.  Some courts, have held that their state securities laws require proof of reliance because the remedial provisions, which borrow language from § 12(2) or § 12(a)(2) of the Securities Act of 1933, define liability according to different statutory sections modeled after SEC Rule 10b-5.  *See* Long et al., *supra* (noting that Georgia and Iowa "incorporate any violation of Section 101 [of the Uniform Securities Act] into their civil-liability provisions" and, "as a result, . . . construe the scope of civil liability in line with Rule 10b-5").  Other courts faced with a similar conflict between a remedial provision modeled after SEC Rule 10b-5 and a liability provision resembling § 12(a)(2) have

_____

[11]Section 12(a)(2) of the Securities Act of 1933 states:

Any person who . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l(a)(2).  This provision is substantively similar to its predecessor, § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2).  *See Gustafson*, 513 U.S. at 567 (quoting language of § 12(2)).

declined to establish a reliance requirement in the absence of express statutory language doing so. *See, e.g., Fed. Home Loan Bank of Seattle v. Credit Suisse,* 449 P.3d 1019 (Wash. 2019) (construing the Washington Security Act); *Countrywide Fin. Corp.*, 2013 WL 49727, at *2-3 (interpreting the Colorado Securities Act); *Green*, 293 S.W.3d at 508 (interpreting the Tennessee Securities Act); *Gohler*, 919 P.2d at 565 (interpreting the Utah Securities Act).

The Court finds the latter approach more persuasive. Defendants have identified no principled reason why the Court should look to federal interpretations of SEC Rule 10b-5, rather than cases construing § 12(a)(2), in determining whether reliance is required under Colo. Rev. Stat. §§ 11-51-501(1)(b) and 11-51-604(4). But it is not clear to the Court why the elements of a Colorado Securities Act claim would necessarily be defined by Colo. Rev. Stat. § 11-51-501(1)(b) when § 11-51-604(4) sets forth the civil cause of action. Section 11-51-604(4) already defines other elements of a Colorado Securities Act claim, including the requirement that the buyer of the security "not know[] of the untruth or omission" by the seller." Colo. Rev. Stat. § 11-51-604(4).

Defendants stress that the Colorado General Assembly amended the remedial provision in 1990 to "*explicitly* predicate[] liability on a violation of Section 501(1)(b)." Docket No. 248 at 16. According to defendants, this amendment made "clear that while Section 604(4) now provides a private right of action, it refers back to Section 501(1)(b) for the substantive elements required to prove a claim." *Id.* at 17. It seems equally plausible, however, that, rather than work a substantive change to the statute, the Colorado General Assembly merely intended to clarify the already-existing relationship between §§ 11-51-123(1)(b) and 11-51-124(3). *Compare* Colo. Rev. Stat. § 11-51-

16

123(1)(b) (1981) (making it unlawful to "make any *untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading*" (emphasis added)), *with* Colo. Rev. Stat. § 11-51-125(3) (1981) (conferring liability on "[a]ny person who offers or sells a security by means of any *untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement, in the light of the circumstances under which it is made, not misleading*") (emphasis added)).[12]

Given the ambiguity regarding which provision, § 11-51-501(1)(b) or § 11-51-604(4), was meant to define the elements of a Colorado Securities Act claim, the Court will not presume that the "Colorado Legislature, in adopting the substantive equivalent of Rule 10b-5, intended that claims for violations of Section 501(1)(b) likewise require proof of reliance." Docket No. 248 at 16. Instead, the Court will give effect to the plain language of the Colorado Securities Act, which does not require proof of reliance for a civil action under § 11-51-604(4). *See Fed Home Loan Bank,* 449 P.3d at 1021-1023 (holding that "[n]o reliance - neither term nor concept - appears" in the Washington Security Act); *MidAmerica Fed. Savings & Loan Ass'n v. Shearson/American Express Inc.*, 886 F.2d 1249, 1254 (10th Cir. 1989) (holding that the plain language of Oklahoma's similarly-worded securities law was "clear in requiring that plaintiff show only lack of knowledge of a misleading statement or omission in order to prevail"); *cf.*

---

[12]Defendants do not cite – and Court has been unable to find – any legislative history directly addressing the purpose of the 1990 amendment to Colo. Rev. Stat. § 11-51-604(4)'s predecessor statute, § 11-51-125(3).

*Black Diamond Fund, LLLP*, 211 P.3d at 736 (declining to "extrapolat[e] from federal law" in construing § 11-51-501(1)(b) because the plain language of the statute supported a conclusion that proof of scienter is not required).

The Court's conclusion that a § 11-51-604(4) claim does not require proof of reliance further accords with the overall structure and purpose of the Colorado Securities Act. The Act's remedial provisions create two distinct causes of action: a fraud-based claim against "any person who recklessly, knowingly, or with an intent to defraud sells or buys a security in violation of section 11-51-501(1)," and a quasi-strict liability claim solely for the sale of a security in violation of § 11-51-501(1)(b). *Black Diamond Fund, LLLP*, 211 P.3d at 736 (internal quotation marks omitted) (discussing remedial provisions of § 11-51-604); *see also* Docket No. 257 at 17.[13] As with their federal counterparts, §§ 10(b) and 12(a)(2), these causes of action differ in that the latter applies in a narrower set of circumstances – the sale of a security – but "give[s] rise to liability more readily." *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).[14] Declining to read a reliance requirement into Colo. Rev. Stat. § 11-51-604(4) is consistent with this general structure.

_____

[13]Section 11-51-604(4) does not create a pure strict liability cause of action because it allows a defendant to avoid liability by showing that he or she "did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." Colo. Rev. Stat. § 11-51-604(4). At least one court has characterized this language as an "inverse negligence standard." *See In re Access Cardiosystems, Inc.*, 776 F.3d 30, 33 (1st Cir. 2015).

[14]Section 11-51-604(4) also limits relief to "the consideration paid for the security, together with interest . . . , costs, and reasonable attorney fees," whereas § 11-51-604(3) allows "such legal or equitable relief that the court deems appropriate, including rescission [and] actual damages . . . ." Colo. Rev. Stat. §§ 11-51-604(3) and (4).

Finally, the Court's holding is in line with other courts' interpretations of state statutes, which, like Colo. Rev. Stat. §§ 11-51-501(1) and 11-51-604(4), are modeled on the Uniform Securities Act. *See Fed. Home Loan Bank,* 449 P.3d at 1026-1028 (distinguishing Washington appellate and federal precedent); *Gohler*, 919 P.2d at 566 (collecting cases holding that various state securities laws modeled after the Uniform Securities Act do not require proof of reliance); *Green*, 293 S.W.3d at 506, 509 (noting that the "overwhelming weight of authority in states with statutes similar to" Tennessee's, which borrows language from the Uniform Securities Act, "is that reliance is not an element of a right of action for false and misleading statements in a securities transaction"); Joel Seligman, *The New Uniform Securities Act*, 81 Wash. U. L. Q. 243, 288 (Summer 2003) (noting that "neither causation nor reliance has been held to be an element of a private cause of action" under the previous version of the Uniform Securities Act).

Because the Court finds that reliance is not a required element of a cause of action under § 11-51-604(4), defendants have failed to demonstrate they are entitled to summary judgment based on plaintiff's purported failure to prove that UWB actually relied on representations in the August 15, 2006 prospectus supplement.

### B.  Underwriting Guidelines

Defendants argue that plaintiff cannot prevail on its claim that defendants misrepresented loan originators' compliance with underwriting guidelines because (1) there is insufficient evidence that defendants' disclosures were false, and (2) any alleged deviations from the underwriting guidelines were immaterial. Docket No. 248 at 19-23; *see also* Colo. Rev. Stat. § 11-51-501(1)(b) (making it unlawful for a person to

"make any untrue statement of a material fact or to omit to state a material fact"). Defendants also contend that plaintiff's underwriting claim is untimely because "monthly Distribution Reports, and other data in UWB's possession" provided UWB and the FDIC with sufficient information "to file that claim well before January 21, 2008." Docket No. 248 at 24-25.

### 1. Timeliness

The Court begins by addressing defendants' argument that plaintiff's underwriting claim is time-barred.

Section 1821(d)(14) of Title 12 (the "FDIC extender statute"), which extends the applicable statute for limitations for claims brought by the FDIC as conservator or receiver, requires the FDIC to bring any tort claim within three years from either the date that it places a failed bank into conservatorship or receivership or the date on which the cause of action accrues. *See* 12 U.S.C. § 1812(d)(14)(A)(ii)-(B); Docket No. 103 at 6-7 (order on motion to dismiss). The FDIC extender statute does not apply, however, if the applicable statute of limitations has run by the time the FDIC is appointed conservator or receiver. *See F.D.I.C. v. Regier Carr & Monroe*, 996 F.2d 222, 225 (10th Cir. 1993) (joining other courts in holding that "the limitation period of [the FDIC extender statute] may not apply retroactively to revive a claim that is already barred by a state statute of limitations"); *see also* Docket No. 86 at 3 (arguing that the FDIC extender statute "gives the Federal Deposit Insurance Corporation as receiver for a failed bank at least three years after it is appointed as receiver to file any claims (state or federal) held by the failed bank that had not expired by the time of failure"). In other words, the extender statute cannot revive a claim that is already time-barred under state law.

Colorado law provides that the limitations period for a claim brought under § 11-51-604(4) of the Colorado Securities Act is three years "after the discovery of the facts giving rise to a cause of action" or "after such discovery should have been made by the exercise of reasonable diligence." Colo. Rev. Stat. § 11-51-604(8). Defendants argue that this period expired prior to January 21, 2011, the date the FDIC was appointed receiver for UWB, because UWB had sufficient information before January 21, 2008 to file its underwriting guidelines claim. Docket No. 248 at 24-25. Defendants rely on plaintiff's allegations that the mortgage loans backing the Certificate experienced high rates of delinquency soon after they were made. *See* Docket No. 248 at 24 (citing complaint, Docket No. 4 at 21, 23-24, ¶¶ 89, 92). In addition, defendants cite monthly distribution reports and "other data" in UWB's possession showing "a steady increase in delinquencies and defaults from 0% to 11.31% by January 2008." Docket No. 248 at 24-25 & n. 10-11. While not disputing that UWB had access to the information cited by defendants prior to January 21, 2008, *see* Docket No. 257; *see also* Docket No. 248 at 11, ¶¶ 45-47, plaintiff contends that defendants cannot show the underwriting guidelines claim is untimely as a matter of law because the Certificate "maintained an investment grade credit rating" as of January 21, 2008 and UWB's monitoring "showed that the Certificate was of high quality with no sign of credit deterioration." Docket No. 257 at 25.

The Court agrees with plaintiff that there is a genuine issue of fact as to whether UWB discovered, or through the exercise of reasonable diligence should have discovered, the alleged underwriting guideline compliance issues before January 21,

2008.[15]  In arguing that plaintiff's claim is time-barred, defendants rely primarily on the

mortgage loans' delinquency rates, which were known to UWB before January 21,

2008.  As other courts have recognized, however,

> [I]t is one thing to know that the securities were not making their expected
> returns, or had even lost long term value in the eyes of investors, and
> quite another entirely to have cause to suspect that [the seller of the
> security] had materially misrepresented the characteristics of the
> collateralized loans and its own due diligence.  A period of poor
> performance by itself may reflect any number of unrelated economic or
> market factors, and is not necessarily sufficient to put investors on notice
> of *systematic* disregard of underwriting procedures, inflation of
> underwriting data or the seller's material misrepresentations.

*CMFG Life Ins. Co. v. RBS Secs. Inc.*, 2013 WL 4483068, at *4 (W.D. Wis. Aug. 19,

2013); *F.D.I.C. v. Chase Mortg. Fin. Corp.*, 2013 WL 5434633, at *5 (S.D.N.Y. Sept. 27,

2013) (relying on same reasoning from *CMFG Life Ins. Co.* to reject statute of

limitations argument).  This, combined with the undisputed facts that (1) JP Morgan and

UWB "both agreed [in March 2007] that [UWB's securities] portfolio was of high quality

---

[15]The parties have not cited – and the Court has not identified – any Colorado
authority interpreting the accrual standard under Colo. Rev. Stat. § 11-51-604(8).  *See
In re Countrywide Fin. Corp. Mortg.-Backed Secs. Litig.*, 84 F. Supp. 3d 1036, 1039
(C.D. Cal. 2014) (noting absence of authority addressing whether Colo. Rev. Stat. § 11-
51-604(8) provides for an inquiry notice or discovery trigger).  It seems likely that the
Colorado Supreme Court would follow the Supreme Court's reasoning in *Merck & Co.,
Inc. v. Reynolds*, 559 U.S. 633 (2010), and hold that "terms such as 'inquiry notice' and
'storm warnings' may be useful to the extent that they identify a time when the facts
would have prompted a reasonably diligent plaintiff to begin investigating," but that "the
limitations period does not begin to run until the plaintiff thereafter discovers or a
reasonably diligent plaintiff would have discovered the facts constituting the violation."
*Id.* at 653 (internal quotation marks omitted); *see also In re Countrywide Fin. Corp.
Mortg.-Backed Secs. Litig.*, 84 F. Supp. 3d at 1039 (holding that a "discovery trigger"
accorded with a "natural reading" of Colo. Rev. Stat. § 11-51-604(8)).  Even under a
more defense-friendly inquiry notice standard, however, the Court finds the delinquency
rates insufficient, standing alone, to trigger the running of the limitations period.

and that there were no signs of any credit deterioration or any problematic securities,"
Docket No. 257 at 14, ¶ 106; *see also* Docket No. 258-14 at 3, and (2) the Certificate
continued to have an investment grade credit rating as of January 21, 2008, Docket No.
257 at 14, ¶ 107, precludes summary judgment that UWB should have, through the
exercise of reasonable diligence, discovered the facts underlying its underwriting
guidelines claim prior to January 21, 2008. *See Nat'l Credit Union Admin. Bd. v. RBS
Secs. Inc.*, 2016 WL 4565689, at *4-*5 (D. Kan. Sept. 1, 2016) (denying summary
judgment on statute of limitations issue where, despite the availability of "sufficient facts
. . . to indicate the possibility of claims against defendants" based on non-compliance
with underwriting guidelines, the fact that the credit ratings of the securities "had not
been downgraded provide[d] the reasonable inference that things [were] not so dire with
th[ose] investments as to indicate the possibility that underwriting guidelines had been
systematically abandoned"); *In re Countrywide Fin. Corp. Mortg.-Backed Secs. Litig.*, 84
F. Supp. 3d at 1040 (rejecting statute of limitations argument on summary judgment
despite defendant's assertion that the bank was "tracking information about the
performance and credit characteristics of the loan pools" and "knew in 2007 that certain
. . . securities had collateral performance issues" (internal quotation marks omitted)); *W.
& S. Life Ins. Co. v. JPMorgan Chase Bank, N.A.*, 54 F. Supp. 3d 888, 902 (S.D. Ohio
2014) (holding that delinquency rates of 10% to 50% and downgrading of securities'
credit rating "were not necessarily sufficient to put plaintiffs on notice of their claims for
fraudulent abandonment of underwriting standards"); *Capital Ventures Int'l v. J.P.
Morgan Mortg. Acquisition Corp.*, 2013 WL 535320, at *7 & n.8 (D. Mass. Feb. 13,
2013) (holding that the "poor performance of the underlying loans" was insufficient to

trigger the applicable limitations period even under the "more defendant-friendly inquiry notice standard"); *see also Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1136 (C.D. Cal. 2011) (noting that "the question of what a reasonably prudent investor should have known is particularly suited to a jury determination" and thus "the defendant bears a considerable burden in demonstrating, at the *summary judgment stage*, that the plaintiff's claim is time barred" (internal quotation marks and bracket omitted)).

### 2. Falsity

Defendants assert that plaintiff cannot show any false statements by defendants regarding American Home's compliance with underwriting guidelines. Docket No. 248 at 19. Specifically, they contend that the finding of plaintiff's underwriting expert, Mr. James Johnson, that 12 of the 5,119 securitized loans failed to comply with the applicable guidelines "is woefully inadequate to establish that American Home was making wholesale, rather than case-by-case, exceptions to their underwriting standards." *Id.* at 20 (internal quotation marks omitted).

As an initial matter, the Court finds that defendants are taking an unduly narrow view of plaintiff's claim. The complaint alleges that defendants' statements about the underwriting guidelines were untrue or misleading both because they failed to disclose that the "originators were making wholesale, rather than case-by-case, exceptions to those underwriting standards" and because "the originators were making extensive exceptions to those underwriting standards when no compensating factors were present." Docket No. 4 at 21, ¶ 86. Although the Court relied on the former allegation in denying defendants' motion to dismiss, nothing in the Court's order purported to limit

24

plaintiff's claim to that allegation alone.  *See* Docket No. 103 at 17-18; *see also In re Washington Mutual Mortg. Backed Secs. Litig*., 2012 WL 2995046, at *9 (W.D. Wash. July 23, 2012) (declining to narrow the scope of the plaintiffs' securities claim where the court's earlier focus on particular allegations "was merely the Court's summary of the allegations, not a bright line rule as to what Plaintiffs ha[d] to show to prove their claim").  Accordingly, plaintiff may also prevail by showing that American Home made exceptions to its underwriting guidelines in the absence of sufficient compensating factors, thereby rendering defendants' statement that the loans "were originated . . . in accordance with the underwriting guidelines," Docket No. 250 at 12, false and/or misleading.[16]

Applying this standard to the present motion, the Court finds a genuine issue of fact as to whether the prospectus supplement contained false and misleading statements regarding American Home's compliance with underwriting guidelines. Plaintiff has provided a report from Mr. Johnson, a professional underwriter and quality control manager, Docket No. 249-10 at 4, who conducted a re-underwriting of a "statistically valid random sample" of mortgage loans backing the Certificate purchased by UWB.  Docket No. 258-12 at 3.  Based on his review, Mr. Johnson concluded that, of the 96 loans in the sample, 12 loans, or approximately 13%, "deviated from American Home's underwriting guidelines and did not have compensating factors that justified

---

[16]The relevant provision of American Home's underwriting guidelines provides that "each case is weighed individually on its own merits and exceptions to [the] underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.  *Id.* at 19; *see also id.* at 17 ("Exceptions to the underwriting standards may be permitted where compensating factors are present.").

approval of those loans."  Docket No. 249-10 at 10.  Plaintiff's statistical expert relied on this data to conclude that 12.5% of the total loans in the HVMLT 2006-7 certificate did not comply with American Home's underwriting guidelines.  Docket No. 257 at 13, ¶ 103; Docket No. 258-12 at 5.[17]

Plaintiff also cites evidence that defendants' own due diligence review revealed guidelines-compliance issues.  *See* Docket No. 257 at 23.  After reviewing defendants' due diligence documents, plaintiff's expert Leonard Blum opined that, of the 501 loans sampled by the due diligence vendor, Clayton, approximately 24% were given a Credit Event Grade of 3.  Docket No. 258-3 at 17 (stating that "preliminary due diligence reports indicated that a total of 118 of the 501 loans reviewed from the sample were graded EV3 for either credit and/or compliance issues").  Clayton defined a Credit Event Grade of 3 as meaning that "[s]ubstantial deviations from the guidelines exist, with no apparent compensating factors to offset the overall risk."  Docket No. 257 at 13, ¶ 98; *see also* Docket No. 258-11 at 3.[18]  It is undisputed that 85% of the loans given a Credit Event Grade of 3 were included in the HVMLT 2006-7 Certificate.  Docket No. 257 at 13, ¶ 100; Docket No. 263 at 6, ¶ 100.

Defendants make several arguments as to why plaintiff's evidence is insufficient to create a genuine issue of fact.  First, defendants assert that, "[e]ven assuming that 12.5% of loans violated guidelines, that is insufficient to render the prospectus supplement materially false given the disclosures that exceptions were permitted."

---

[17]Defendants admit that this fact is disputed.  Docket No. 263 at 6, ¶ 103.

[18]Defendants dispute this fact but do not provide an alternate definition.  Docket No. 263 at 6, ¶ 98.

Docket No. 263 at 10.  As another court has explained, however, "disclosures that describe lenient, but nonetheless existing guidelines about risky loan collateral, would not lead a reasonable investor to conclude that the mortgage originators could entirely disregard or ignore those loan guidelines."  *Genesee Cty. Emps. Retirement Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1176-77 (D.N.M. 2011) (internal quotation marks and brackets omitted); *see also* Docket No. 103 at 18 (rejecting argument that "general warnings" regarding the use of exceptions to the underwriting guidelines based on the existence of compensating factors were sufficient to warn investors that the "underwriting standards were systematically abandoned" (internal quotation marks and ellipsis omitted)).  Here, the offering documents stated that "exceptions to American Home's underwriting guidelines [were] allowed if sufficient compensating factors exist[ed] to offset any additional risk."  Docket No. 250 at 19. Because plaintiff's evidence shows that exceptions were made even in the absence of compensating factors, there is a genuine issue of fact as to whether defendants' disclosures were false or misleading.  *Cf. Nat'l Credit Union Admin. Bd. v. RBS Secs., Inc.*, 900 F. Supp. 2d 1222, 1260 (D. Kan. 2012) (plaintiff's claim that "defendants represented that underwriting standards would generally be followed and that exceptions would be made when compensating factors were present, but that this was untrue," was sufficient to survive motion to dismiss), *aff'd sub nom. Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199 (10th Cir. 2014), *vacated on other grounds by Nomura Home Equity Loan, Inc. v. Nat'l Credit Union Admin. Bd.*,

134 S. Ct. 2818 (2014).[19]

Defendants challenge plaintiff's reliance on the findings of their due diligence review, asserting that, contrary to plaintiff's characterizations, defendants "did not categorically waive the initial findings, but worked with its vendor to scrutinize each loan." Docket No. 263 at 10-11 n.9; *see also id.* at 6, ¶ 100 (admitting that "RBS included in HVMLT 2006-7 nearly 85% of the loans that [the due diligence vendor] initially graded 3," but contending that "it is undisputed that RBS did not categorically waive initial findings"). In support of this argument, defendants rely on an expert report by Myron Glucksman in which he states that "RBS, [American Home Mortgage], and Clayton worked together to address as many exceptions as possible with regard to the loans with credit and compliance exceptions" before the closing of the Certificate on August 15, 2006. Docket No. 264-10 at 9, ¶ 122. By way of illustration, Mr. Glucksman discusses three loans whose credit/compliance issues were resolved during the tie-out process. *See id.* at 9-10, ¶ 122 & n. 164. However, Mr. Glucksman also states in his report that "30 of the 45 loans that received a credit and/or compliance grade of '2W' or '3' in the last available due diligence report were securitized in HVMLT 2006-7." *Id.* at 10 n.166. Defendants therefore have not established the absence of any factual dispute as to whether loans reflecting "substantial deviations from the guidelines" with "no apparent compensating factors" were included in the Certificate.[20]

---

[19]To the extent defendants' argument is directed at the degree or magnitude of the alleged falsity, it is more properly addressed as part of the Court's materiality analysis below.

[20]In any event, plaintiff is correct that "disagreements between experts are not appropriate for resolution on summary judgment." Docket No. 257 at 23.

Defendants' final argument is that the Court should not credit Mr. Johnson's opinions because they "would fail *Daubert* scrutiny."  Docket No. 263 at 10.  However, defendants have not moved to exclude Mr. Johnson's testimony under Fed. R. Evid. 702, and the Court declines to ignore his opinions based on the suggestion that they are unreliable.  *See* Docket No. 263 at 10.

For the reasons discussed above, plaintiff has demonstrated a genuine issue of fact as to whether defendants made false or misleading statements regarding American Home's compliance with underwriting guidelines.

### 3. *Materiality*

Defendants contend that any alleged deviations from the underwriting guidelines "would not have been material to a reasonable investor in 2006" because (1) Mr. Johnson did not consider whether the "alleged guideline deviations materially increased the credit risk of any of the loans," Docket No. 248 at 21; (2) his "defect findings for 9 of the 12 loans rests on the incredible assumption that the loan files he reviewed . . . were identical to the loan files as they existed for the original underwriters," *id.* at 22; and (3) any remaining deviations are insufficient, as a matter of law, to "significantly alter the total mix of information made available to a reasonable investor in 2006."  *Id.* at 23.

As to the first argument, it is undisputed that Mr. Johnson did not evaluate whether the underwriting defects he identified materially impacted the credit risk of the loans.  Docket No. 248 at 10, ¶ 44.  However, defendants do not cite any authority for the proposition that a guidelines deviation must "materially increase" credit risk to qualify as material.  In fact, plaintiff's expert, Mr. Blum, testified that guidelines deviations – and specifically, missing document issues –  raise a number of concerns,

not all of which relate to credit risk.  For example, he stated that missing documents might indicate fraud, make the loans impossible to underwrite, or make it "difficult or impossible to enforce rights and remedies in the event of foreclosure."  Docket No. 264-4 at 11, 363:2-14; *see also* Docket No. 258-3 at 10 (noting that missing loan documentation can be an "indicia of fraud," can "diminish the value or enforceability of a mortgage loan," and can prevent certain re-underwriting tests from being performed).  Moreover, defendants ignore that non-compliance with underwriting guidelines, by its very nature, can make it impossible to accurately assess the credit risk of a particular loan.  *See Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 571 (S.D.N.Y. 2015) (noting that "[c]ompliance with underwriting guidelines gave assurance about the credit risk associated with the loans and the reliability of the statistics reported in the Collateral Tables"), *aff'd sub nom. Fed. Housing Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85 (2d Cir. 2017); *see also* Docket No. 264-4 at 4, 303:9-13 (stating that "compliance with underwriting guidelines is not just numbers like DTI ratios; it's also the process of how the loan is originated, for example, verifying ratios"), 7, 317:11-21 ("[I]f [the loans] complied with underwriting guidelines, things like DTI ratios would have been checked for reasonableness, owner occupancy would have been checked for reasonableness, the employment status of stated income borrowers probably would have been checked.  It's a whole different ballgame.").[21]

---

[21]Defendants' challenge to Mr. Johnson's findings regarding one particular loan, *see* Docket No. 248 at 21, n. 8, may call into question the reliability of that opinion, but is insufficient to demonstrate the absence of any genuine factual dispute as to materiality.

Defendants' second argument – that Mr. Johnson's opinions are insufficient to show materiality because they rest on a counterfactual assumption regarding the completeness of the loan files at the time of origination – is also unavailing. Defendants cite evidence indicating that since, 2006, data in the loan files may have been lost, corrupted, or rendered unavailable for production. *See* Docket No. 248 at 9-10, ¶¶ 33-36, 42-43; Docket No. 250-5 at 2; Docket No. 250-6 at 2-3. However, none of this evidence conclusively establishes that the missing loan documents existed at the time of origination. *See, e.g.*, Docket No. 250-5 at 2 ("The Trust does not know if this data corruption issue affected any of the data being produced to you."); Docket No. 250-6 at 2 (stating that "the PaperVision loan file may contain identical information as to that which is contained in the [more comprehensive] UniFi system"). Accordingly, whether the loan files were complete at the time of origination constitutes an issue of fact not appropriate for resolution at the summary judgment stage. *See MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Secs. Inc.*, 2015 WL 764665, at *16 (S.D.N.Y. Jan. 9, 2015) (declining to resolve, at summary judgment stage, "whether the loan files were incomplete at the time of origination, whether loan approvals existed for certain loans and were subsequently misplaced, or the extent to which the composition of loan files changed as they were transferred over time").

Finally, a reasonable jury could find that the guidelines deviations identified by Mr. Johnson would have been material to a reasonable investor in 2006. Assessing materiality under § 11-51-501(1) of the Colorado Securities Act requires a fact-specific inquiry. *See Thorne v. Bauder*, 981 P.2d 662, 664 (Colo. App. 1998) ("Generally, the question whether an undisclosed fact is 'material' [for purposes of the Colorado

31

Securities Act] is a question for the factfinder."); *see also Turner Ins. Agency, Inc. v. Farmland Partners Inc.*, No. 18-cv-02104-DME-NYW, 2019 WL 2521834, at *4 (D. Colo. June 18, 2019) ("In order to determine whether a misleading statement or omission is material [under the federal securities law], courts must engage in a fact-specific inquiry."). "A misrepresented or omitted fact is considered material . . . if there is a substantial likelihood that a reasonable investor would consider the matter important in making an investment decision." *Goss v. Clutch Exchange, Inc.*, 701 P.2d 33, 36 (Colo. 1985) (construing earlier version of statute). A reasonable investor would consider a matter important if he or she "would regard it as significantly altering the 'total mix' of information made available." *Id.*

Courts applying the same standard under federal law,[22] have considered "both quantitative and qualitative factors . . . in assessing a statement's materiality." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) ("*ECA*") (citing SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150, 45150-52 (1999)); *see also Turner Ins. Agency, Inc.*, 2019 WL 2521834, at *4. The quantitative factor relates to the "financial magnitude of the misstatement." *ECA*, 553 F.3d at 197; *see also Nacchio*, 519 F.3d at 1162. In analyzing this factor, the Securities Exchange Commission has suggested a five percent "threshold below which

---

[22]*See Thorne*, 981 P.2d at 664 (citing cases indicating that the materiality standard is the same under Colorado and federal law); *see also United States v. Nacchio*, 519 F.3d 1140, 1158 (10th Cir. 2008) (stating that the "basic test" for materiality under the federal securities laws is "whether there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" (internal quotation marks omitted), *vacated in part on other grounds on reh'g en banc*, 555 F.3d 1234 (10th Cir. 2009).

[a misstatement] is presumptively immaterial." *ECA*, 553 F.3d at 197; *see also* SEC

Staff Accounting Bulletin No. 99, 64 Fed. Reg. at 45151 ("The use of a percentage as a

numerical threshold, such as 5%, may provide the basis for a preliminary assumption

that – without considering all relevant circumstances – a deviation of less than the

specified percentage with respect to a particular item on the registrant's financial

statements is unlikely to be material.").  The Tenth Circuit has endorsed this numerical

threshold "as a sensible starting place" for assessing materiality, *see Nacchio*, 519 F.3d

at 1162, and at least one court has applied it to hold that a greater-than-five-percent

deviation from full compliance with underwriting criteria supported a finding that the

disclosures contained in a prospectus supplement were materially misleading.  *See

Nomura Holding Am., Inc.,* 873 F.3d at 147-48 (approving of district court's use of "5%

falsity as a threshold for materiality"); *see also* Asset-Backed Securities, SEC Release

No. 8518, 2004 WL 2964659, at 235 (Dec. 22, 2004) (requiring supplemental

disclosure "if any material pool characteristic of the actual asset pool at the time of

issuance of the asset-backed securities differs by 5% or more . . . from the description

of the asset pool in the prospectus filed for the offering").  Here, the reports of plaintiff's

experts James Johnson and Dr. Charles Cowan indicate that at least 12.5% of the

loans backing the Certificate were originated in violation of American Home's

underwriting standards.  *See* Docket No. 257 at 13, ¶ 103; Docket No. 249-10 at 11;

Docket No. 258-12 at 5.[23]  Accordingly, the quantitative factor supports a finding of

---

[23]For the reasons discussed above, the Court declines to exclude certain of Mr. Johnson's findings on the basis that "they rely on a counterfactual assumption about missing documents."  Docket No. 263 at 11.

materiality.[24]

Turning to qualitative factors, plaintiff has presented evidence that deviations from the underwriting guidelines would have been viewed by a reasonable investor as "significantly altering the 'total mix' of information made available." *Goss*, 701 P.2d at 36. Mr. Blum stated in his expert report that "[u]nderwriting guidelines provide transparency and consistency to the mortgages of a given originator. Compliance with applicable guidelines is indicative of strong controls, policies, and procedures." Docket No. 258-3 at 7. He further opined that "it would be important to investors if underwriting guidelines were not being followed." *Id.* at 8. Similarly, Ben Hirsch and Pat Howard, the UWB employees who approved purchase of the certificate, Docket No. 248 at 6, ¶ 9, testified that knowledge of American Home's noncompliance with underwriting guidelines would likely have affected UWB's decision to purchase the Certificate. *See* Docket No. 258-6 at 6-7, 348:21-349:17; Docket No. 258-7 at 7-8, 304:17-305:3. Mr. Howard explained that evidence of noncompliance would have "indicated a different level of risk than what [their] perception of that rating indicated at

---

[24]Defendants argue that "guideline compliance is not a material characteristic of the asset pool." Docket No. 263 at 11 (internal quotation marks omitted). However, the regulation defendants cite sets forth a non-exhaustive list of material pool characteristics with the caveat that "the material characteristics will vary depending on the nature of the pool assets." 17 C.F.R. § 229.1111(b). Elsewhere, the regulation instructs that, "[i]f any assets in the pool deviate from the disclosed underwriting criteria . . . [,] [the seller should] disclose how those assets deviate from the disclosed underwriting criteria or other criteria or benchmark used to evaluate the assets and include data on the amount and characteristics of those assets that did not meet the disclosed standards." *Id.*, § 229.1111(a)(8). Courts have considered disclosure requirements to constitute evidence of materiality. *See, e.g.*, *Nomura Holding Am., Inc.*, 104 F. Supp. 3d at 559 (finding Regulation AB's requirement that "deviations from underwriting guidelines" be disclosed to constitute "evidence of materiality").

the time."  Docket No. 258-7 at 8, 305:4-11.  The Court finds these statements,

combined with the evidence showing that American Home's deviations from the

underwriting guidelines exceeded the five percent threshold, sufficient to create a

genuine issue of fact as to whether defendants' disclosures were materially false or

misleading.  *See Nomura Holding Am., Inc.*, 873 F.3d at 148 (approving of district

court's analysis of materiality on summary judgment that considered the 5% falsity

threshold in combination with evidence that the false underwriting guidelines statements

in the prospectus supplements "would [have been] viewed by the reasonable PLS

investor as significantly altering the total mix of information available"); *Nomura Holding*

*Am., Inc.*, 104 F. Supp. 3d at 570-71 (citing, with respect to qualitative factors, evidence

that "[c]ompliance with underwriting guidelines gave assurance about the credit risk

associated with the loans and the reliability of the statistics reported in the Collateral

Tables").  Defendants are therefore not entitled to summary judgment on plaintiff's

underwriting guidelines claim.

### C.  Opinions Regarding Value

Defendants move for summary judgment on plaintiff's appraisal inflation and LTV

claims, asserting that plaintiff cannot show the "original appraisers' opinions of value

were not honestly-held."  Docket No. 248 at 27.[25]  Plaintiff responds that it is not

required to prove subjective falsity and that, even if it were, there is sufficient evidence

---

[25]Plaintiff appears to base its claims on the allegedly false and misleading
statements that "the weighted average LTV of the underlying loans was 75.27%," that
"the weighted average effective LTV of the underlying loans was 64.86%," and that
"[e]very mortgage loan [was] secured by a property that has been appraised by a
licensed appraiser in accordance with the Uniform Standards of Professional Appraisal
Practice."  *See* Docket No. 257 at 8, 11, ¶¶ 70, 88.

for a reasonable jury to conclude that both defendants and the original appraisers subjectively knew the appraisals to be inaccurate.  Docket No. 257 at 26-28.

Section 11-51-501(1)(b) of the Colorado Securities Act makes it unlawful "for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."  In construing a similar provision, § 11 of the Securities Act of 1933, the Supreme Court has distinguished between statements of fact and statements of opinion and held that the latter can give rise to liability under § 11 only if the belief professed was not honestly held.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015).[26]  The Supreme Court has also explained, however, that "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion – or, otherwise put, about the speaker's basis for holding that view."  *Id.* at 1328.  Thus, the omission of "material facts about the issuer's inquiry into or knowledge concerning a statement of opinion" may give rise to liability "if those facts conflict with what a reasonable investor would take from the statement itself."  *Id.* at 1329.

Relying on this holding, plaintiff argues that it has presented sufficient evidence to show that defendants' statements about the LTVs were misleading because

_____

[26]The Court also stated that a statement of opinion could give rise to liability under § 11 if an embedded statement of fact were found to be untrue.  *See id.* at 1327.  However, that aspect of *Omnicare*'s holding is not at issue in this case.

defendants failed to disclose that a significant number of the appraisals used to calculate the LTVs did not conform to USPAP.  Docket No. 257 at 26-27.[27]  The Court agrees.  Plaintiff has submitted a report by Dawn Molitor-Gennrich, an appraisal expert, who reviewed the appraisals for 96 of the securitized mortgage loans to determine whether they complied with USPAP.  *See* Docket No. 257 at 14, ¶ 104; Docket No. 258-13 at 3-4.[28]  Based on her review, Ms. Molitor-Gennrich concluded that 69% of the appraisals for the sampled mortgage loans did not comply with USPAP to such an extent that they were rendered non-credible.  Docket No. 257 at 14, ¶ 104; Docket No. 258-13 at 5.[29]  Dr. Cowan extrapolated this finding to determine that 68.8% of the loans backing the HVMLT 2006-7 Certificate had appraisals that were not credible.  *See* Docket No. 257 at 14, ¶ 105; Docket No. 258-12 at 6.  This evidence raises a genuine issue of fact as to whether the appraisals complied with USPAP and supports a finding that defendants' statements regarding the LTVs were materially misleading.  *See FDIC v. RBS Secs., Inc.*, No. 14-cv-00126-XR, Docket No. 154, at *13 (W.D. Tex. May 9, 2018) (finding that the "FDIC ha[d] raised a genuine factual dispute as to whether the

---

[27]In fact, the prospectus supplement affirmatively stated that "[e]very mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice."  Docket No. 257 at 11, ¶ 88; *see also* Docket No. 250 at 18.

[28]These loans were selected by Dr. Cowan to reflect a statistically valid random sample of the loan pool backing the Certificate.  *See* Docket No. 257 at 13, ¶ 101; Docket No. 258-12 at 3, ¶¶ 1-2, 4.

[29]According to plaintiff's expert, Mr. Blum "USPAP defines credibility as 'worthy of belief' and specifies that 'credible assignment results require support, by relevant evidence and logic, to the degree necessary for the intended use.'"  Docket No. 258-3 at 5 (internal bracket omitted).

appraisals complied with USPAP, which itself could prove actionable even without evidence of subjective falsity"); *Nomura Holding Am., Inc.*, 104 F. Supp. 3d at 566-67 (holding that the "record support[ed] a finding of falsity based on the omission doctrine described in *Omnicare*" where the plaintiff had presented evidence that the appraisals failed to conform to USPAP).[30]

The Court also finds that plaintiff has presented sufficient evidence to show that defendants and the original appraisers did not honestly believe the opinions of value and that the values derived from the appraisals were objectively false. *See Omnicare*, 135 S. Ct. at 1326 n.2 (explaining that an objectively accurate statement would not be actionable under § 11 even if the speaker believed the statement to be false at the time it was made); *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 130 (S.D.N.Y. Feb. 14, 2014) (explaining that a statement of opinion is actionable if it is "(1) objectively untrue and (2) not believed by the speaker"). First, Ms. Molitor-Gennrich's finding that a significant proportion of the appraisals was not credible constitutes "strong circumstantial evidence that at the time the appraiser[s] prepared the appraisal[s] [they] did not believe in the value reflected therein." *Nomura Holding Am., Inc.*, 104 F. Supp. 3d at 498. Additionally, plaintiff has presented evidence showing that the appraisal values for certain loans were inflated by more than twenty percent and that defendants knew of that inflation at the time the loans were included in the Certificate. *See* Docket No. 257 at 12, ¶ 93; Docket No. 258-3 at 26 (reflecting that 7 loans with a negative 20% variance in appraisal value after reconciliation were included in the securitization);

---

[30]Defendants do not challenge the materiality of the alleged misstatements/omissions.

Docket No. 264-10 at 14-15, ¶¶ 132-33 (same); Docket No. 249-23 at 17 (concluding, based on the use of a retroactive automated valuation model ("AVM"), that the weighted average LTV of the securitized loans was 85.52%, more than 10% higher than the original average LTV reported in the prospectus supplement); *see also* Docket No. 257 at 8, ¶ 70 ("RBS's prospectus supplement for the Certificate stated that the weighted average LTV of the underlying loans was 75.27% . . . .").[31]  Defendants contend that plaintiff's AVM analysis, which indicates that the actual weighted average LTV of the securitization was ten percent higher than the weighted average LTV disclosed in the prospectus supplement, Docket No. 249-23 at 17, cannot "conclusively prove that the original appraisals were intentionally inflated."  Docket No. 263 at 13 (internal quotation marks omitted).  Defendants may be correct that such evidence is not "conclusive." However, it is sufficient to create a genuine issue of fact as to whether the LTVs disclosed in the prospectus supplement were objectively false.  *See Nomura Holding Am., Inc.*, 104 F. Supp. 3d at 498-500 (finding "strong evidence that a significant percentage of the original appraisals for the Sample properties did not reflect the actual values of the properties" based on a retroactive AVM analysis conducted by the

---

[31]Defendants deny that loans with values that varied more than ten percent from their appraised values were included in the Certificate, stating that "RBS . . . removed from the securitization loans it was not convinced had a supported appraised value." Docket No. 263 at 5, ¶ 93; *see also id.* at 13; Docket No. 264-10 at 15, ¶ 133 (opining that "RBS's decision to purchase and securitize these seven loans appears reasonable based on the documentation available in the record").  However, whether RBS reasonably determined that particular loans "had a supported appraised value" is an issue of fact not appropriate for resolution on summary judgment.  *See* Docket No. 249-23 at 4 (stating "opinion that the appraisal values on which the original weighted average LTVs were based are biased in favor of overvaluation"); Docket No. 258-3 at 18-21 (criticizing reasonableness of RBS's due diligence review of appraisal and LTV values).

plaintiff's expert).

For the foregoing reasons, defendants are not entitled to summary judgment on plaintiff's LTV and appraisal claims.

### D.  Damages

Section 11-51-604(4) of the Colorado Securities Act provides, in relevant part, that a buyer of a security "may sue to recover the consideration paid for the security, together with interest at the statutory rate from the date of payment, costs, and reasonable attorney fees, less the amount of any income received on the security, upon the tender of the security."  Colo. Rev. Stat. § 11-51-604(4).  The parties dispute the rate of interest that applies under this section.  Defendants contend that interest should be calculated at the Coupon Rate set by the Certificate.  *See* Docket No. 248 at 28 (citing interest rates set forth in Certificate, Docket No. 250 at 3, 9).  They rely on § 5-12-102 of the Colorado Consumer Credit Code, which governs the prejudgment interest rate in cases not involving personal injury.  *See Goodyear Tire & Rubber Co. v. Holmes*, 193 P.3d 821, 824-25 (Colo. 2008).  Under that section,

> (1) Except as provided in section 13-21-101, C.R.S., when there is no agreement as to the rate thereof, creditors shall receive interest as follows:
>
> (a) When money or property has been wrongfully withheld, interest shall be an amount which fully recognizes the gain or benefit realized by the person withholding such money or property from the date of wrongful withholding to the date of payment or to the date judgment is entered, whichever first occurs; or, at the election of the claimant,
>
> (b) Interest shall be at the rate of eight percent per annum compounded annually for all moneys or the value of all property after they are wrongfully withheld or after they become due to the date of payment or to the date judgment is entered, whichever first occurs.

(2) When there is no agreement as to the rate thereof, creditors shall be allowed to receive interest at the rate of eight percent per annum compounded annually for all moneys after they become due on any bill, bond, promissory note, or other instrument of writing, or money due on mutual settlement of accounts from the date of such settlement and on money due on account from the date when the same became due.

Colo. Rev. Stat. § 5-12-102. Defendants argue that, "[b]ecause the Certificate provides for simple interest at the Coupon Rate, there is 'agreement as to the rate thereof,' and the default statutory rate of 8% per year compounded annually is rendered inapplicable by the plain terms" of § 5-12-102(2). Docket No. 248 at 29. Plaintiff responds that the Coupon Rate would only apply under § 5-12-102(2) if "this were an action for failure to make payments when due pursuant to the terms of the Certificate," Docket No. 257 at 30; however, because this is a case of wrongful withholding, and there is no agreed-upon rate for the prejudgment interest on that withholding, "the FDIC may elect an 8% statutory rate" pursuant to § 5-12-102(1). *Id.* at 29-30.

The Court agrees with plaintiff that § 5-12-102(1) governs the award of prejudgment interest in this case. Defendants contend that the provision is inapplicable because defendants were not responsible for issuing or withholding payments under the Certificate. Docket No. 263 at 14. However, "[t]he phrase 'wrongfully withheld' is read broadly to cover all types of cases, even where the withholding is merely a refusal to pay over damages which are theoretically due at the time the claim arises." *In re Weaver*, 579 B.R. 865, 910 (Bankr. D. Colo. 2018) (quoting *Mesa Sand & Gravel Co. v. Landfill, Inc.*, 776 P.2d 362, 365 (Colo. 1989)); *see also Goodyear Tire & Rubber Co. v. Holmes*, 193 P.3d 821, 827 (Colo. 2008) (stating that "wrongful withholding occurs when plaintiff's injury is measured because the damages, if then paid, would make the

plaintiff whole" (internal quotation marks omitted)).  Here, plaintiff is not seeking investment income "due on" the Certificate, Colo. Rev. Stat. § 5-12-102(2), but rather "damages equal to the price paid for the certificate" minus income received "and the value of the certificate on the date of disposition."  Docket No. 4 at 30, ¶ 134. Accordingly, § 5-12-102(1)(b) applies.

The Court also agrees that the Coupon Rate set forth in the Certificate does not constitute an agreement as to the applicable prejudgment interest rate.  The purpose of prejudgment interest under Colo. Rev. Stat. § 5-12-102 is to compensate a plaintiff for the lost "time value of money" and "discourage a person responsible for payment of a claim to stall and delay payment until judgment or settlement."  *Mesa Sand & Gravel Co.*, 776 P.2d at 364; *Goodyear Tire & Rubber Co.*, 193 P.3d at 826 ("[T]he purpose of prejudgment interest is to reimburse the plaintiff for inflation and lost return.").  There is no indication that the Coupon Rate, which reflects the interest UWB was entitled to receive as income from its investment, *see* Docket No. 250 at 9 ("On each distribution date, to the extent funds are available from the mortgage loans in the related mortgage loan group or groups, each class of offered certificates will be entitled to receive accrued and unpaid interest determined on the basis of the related outstanding class principal balance immediately prior to that distribution date . . . ."); *see also* Docket No. 248 at 13, ¶¶ 60, 62, was intended to serve this function.  As stated above, plaintiff is not seeking to recover income owed under the Certificate, but to restore UWB to the position it would have been in had the security never been purchased.  *See* Colo. Rev. Stat. § 11-51-604(4); Docket No. 4 at 30, ¶ 134; Docket No. 249-24 at 3, ¶ 20; *cf. Austin v. Loftsgaarden*, 675 F.2d 168, 180-181 (8th Cir. 1982) (explaining that, for

42

federal securities fraud claims, "a rescissional remedy or some other measure of damages in the nature of restitution may be applied" to reflect "the extent to which false and misleading information actually harmed the complaining party" (internal quotation marks omitted)).[32]  Any award of prejudgment interest should therefore be calculated to compensate for the lost time value of money necessary to restore UWB to its pre-purchase position.  The Coupon Rate in the Certificate bears no relationship to that calculation.  *XY, LLC v. Trans Ova Genetics, LC*, No. 13-cv-0876-WJM-NYW, 2016 WL 1391615, at *13-14 (D. Colo. Apr. 8, 2016) (holding contractual interest rate inapplicable to issue of prejudgment interest where the rate applied to the "interest on underpayments revealed during an audit, not prejudgment interest after a jury verdict"), *vacated in part on other grounds*, 890 F.3d 1282 (Fed. Cir. 2018).

The authorities defendants cite do not compel a different conclusion.  Each of the cases arises in a different legal or factual context and supports the unremarkable proposition that a court should calculate prejudgment interest according to the parties' agreed-upon rate when a plaintiff is suing to recover money owed under a contract that specifies the rate at which interest should accrue in the event of default.  *See, e.g.*, *Four Strong Winds, Inc. v. Lyngholm*, 826 P.2d 414, 415, 420 (Colo. App. 1992) (awarding interest at agreed-upon rate in action to collect money due on promissory

---

[32]Defendants' assertion that plaintiff is seeking to recover "'all moneys' that UWB would have received while it held the Certificate had the Certificate not incurred any losses," Docket No. 263 at 14, is belied by their earlier acknowledgment that the "remedy provided by CSA Section 604(4) is . . . designed to restore a plaintiff to the position that it was in before the purchase."  Docket No. 248 at 30, n. 16*; see also* Docket No. 294-24 at 4 (calculating plaintiff's damages as the "total consideration paid. . . , *less* the net proceeds received . . . , *less* the amount of principal and interest distributions").

note); *Ebrahimi v. E.F. Hutton*, 794 P.2d 1015, 1019 (Colo. App. 1989) (considering argument that the trial court "improperly refused to award prejudgment interest on the amount due under the promissory note"); *Sherwood v. BRT Corp.*, No. 12-cv-02782-RM-KMT, 2014 WL 5763191, at *7 (D. Colo. July 8, 2014) (finding a genuine issue of fact as to whether the agreement creating the debt between the plaintiff and the defendant "included an interest rate other than eight percent"), *report and recommendation adopted by* 2015 WL 232148 (D. Colo. Jan. 15, 2015).[33] Under such circumstances, the contract rate reflects the parties' agreement as to the interest necessary to compensate the non-breaching party for the lost time value of the money owed on the contract. Here, however, plaintiff is not suing for money owed under the Certificate, and the Coupon Rate reflects an element of UWB's investment income, not an agreement as to the lost time value of money. Accordingly, the default statutory rate of eight percent, and not the Coupon Rate, will govern the Court's calculation of prejudgment interest.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendants' Omnibus Motion for Summary Judgment [Docket No. 248] is **DENIED**.

_____

[33]To the extent that *National Credit Union Administration Board v. UBS Securities LLC*, 2016 WL 1179203 (S.D.N.Y. Mar. 24, 2016), could arguably support defendants' position, *see* Docket No. 248 at 30, the Court finds it unpersuasive.

DATED January 30, 2020.

BY THE COURT:

 S/Philip A. Brimmer
_____
PHILIP A. BRIMMER
Chief United States District Judge